## SEAWEL *v.* DIRST.

Opinion delivered February 8, 1902.

1. HOMESTEAD—DEFECTIVE ACKNOWLEDGMENT—CURATIVE ACT.—Where a wife joined with her husband in the execution of a deed conveying his homestead, but merely acknowledged that she signed and sealed a relinquishment of dower, the defect was cured by the curative act of March 8, 1895. (Page 168.)

2. INSANITY—VALIDITY OF CONVEYANCE.—To establish the invalidity of a deed upon the ground of the grantor's insanity, it is not sufficient to prove that the grantor was a monomaniac and possessed of insane delusions on subjects not connected with the conveyance, but it must be shown that his insanity was such as to prevent him from intelligently comprehending and acting upon the business affairs out of which the conveyance grew. (Page 169.)

Appeal from Marion Circuit Court in Chancery.

ELBRIDGE G. MITCHELL, Judge.

Reversed.

### STATEMENT BY THE COURT.

On the 1st day of July, 1896, A. L. Dirst and his wife, J. W. Dirst, executed a deed of trust conveying 160 acres of land in Marion county to J. C. Floyd as trustee to secure certain promissory notes executed on that day by A. L. Dirst to W. Q. Seawel and other parties named in the deed of trust, and to whom he was indebted for goods and supplies furnished to him.

The notes not being paid at maturity, Seawel and the other parties brought suit in the circuit court to recover judgment on the notes and to foreclose the deed of trust. They alleged in the complaint that the land described in the deed of trust was the homestead of Dirst and his wife, and that in 1894, prior to the

execution of their deed of trust, Dirst and his wife had executed a mortgage on the same land to Margaret S. Williams; that the wife of Dirst did not join in the execution of said mortgage, and that it was for that reason void, and they asked that it be set aside and declared void by the decree of the court, and that the trust deed to Floyd be foreclosed.

A. L. Dirst and his wife, J. W. Dirst, appeared, and answered that A. L. Dirst, at the time he executed the notes and trust deed to Floyd was of unsound mind, and not competent to make said contract or to bind himself by the execution of said note and mortgage.

A guardian *ad litem* also appeared for A. L. Dirst, and he also set up the defense that Dirst was insane at the time the note and mortgage were executed.

Mrs. Margaret S. Williams appeared, and for answer denied that the mortgage executed by A. L. Dirst and wife to her was void; alleged that it was valid, and that the debt it was given to secure had not been paid; and asked for a decree foreclosing the same.

On the hearing the court found that the mortgage of Margaret S. Williams was a valid and subsisting lien upon the land, and gave judgment in her favor for the sum of $1,156.25, and ordered that, in the event such sum was not paid within twelve months, the land be sold for the payment of the judgment. The court further found that A. L. Dirst was insane at the time he executed the deed of trust to Floyd and the notes to Seawel and others to secure which the trust deed was executed. The court therefore adjudged that the trust deed and notes were void, but found that the accounts for which the notes were executed were made and contracted before Dirst became insane, and the court gave judgment in favor of the plaintiffs for the amount of their respective accounts. From this judgment all parties except Margaret S. Williams appealed.

*S. A. Woods* and *J. C. Floyd,* for appellants.

Even if a party be insane, his contract, made during a lucid interval, is binding. Bish. Cont. § 959; 3 Grant (Pa.), 162; 5 B. Mon. 222; 9 Vt. 605; 27 Ill. 395; 1 Wash. (Va.), 224. To relieve a person from a contract on the ground of insanity, it must appear that the contract was the direct result of insanity, and

that the party could not understand the nature and consequences of his act. 11 Am. & Eng. Enc. Law, 132; Bish. Cont. §§ 961, 962, 963; 8 C. E. Greene, 509; 55 Me. 256; 36 Ill. 109; 4 Bush, 239; 44 N. H. 531; 3 Hill, 513; 75 N. C. 471. In the absence of a showing of improper influence brought to bear on the party, the contract will stand. Bish. Cont. § 964; 36 Fed. 126; 66 Ill. 25 12 La. An. 624; 11 Pa. 147-8; 33 Leg. Int. 405. Contracts for necessaries are binding, regardless of mental condition. 11 Am. & Eng. Enc. Law, 134; Bish. Cont. § 968; 23 Ark. 417; 2 Car. & P. 392. A contract honestly made with a person of unsound mind, upon a fair consideration, cannot be rescinded without an offer to restore the consideration. 9 N. E. 167; 3 Am. & Eng. Enc. Law, 862; Bish. Cont. §§ 957, 958, 959, 968, 969, 970; 7 De G. M. & G. 475-487; 97 Pa. St. 549; 34 Kan. 8; 113 Ill. 425; 83 Ind. 18; 81 Ind. 433; 92 Pa. St. 428.

*Horton & South* and *Pace & Pace,* for appellees.

The burden was on appellees to show unsoundness of mind, but this obligation was fully discharged. The burden was on appellant to show that the conveyance was executed in a lucid interval. 19 Ark. 533, 545.

RIDDICK, J., (after stating the facts.) This is an action brought by certain creditors of A. L. Dirst to foreclose a trust deed upon 160 acres of land, executed by Dirst and his wife to secure the payments of notes given by him to plaintiffs, and also to set aside and declare void a previous mortgage executed by Dirst and his wife to Margaret S. Williams upon the same land.

Plaintiffs contended that, as the land mortgaged was the homestead of Dirst and his wife, the mortgage to Mrs. Williams was invalid, because the wife did not join in the execution and acknowledgment of the same as required by the statute. But the mortgage on its face appears to be the joint deed of A. L. Dirst and J. W. Dirst, his wife, the names of both of them appearing in the body of the deed as grantors. It is true that the certificate showing the acknowledgment of the deed on the part of the wife was defective in that it did not show that she acknowledged the execution of the deed, but only that she acknowledged that she had signed and sealed a relinquishment of dower. This defect in the acknowledgment was, however, cured by the subsequent act of March 8, 1895. Plaintiffs say that this act was evidently in-

tended to cure defects in the certificate of acknowledgment result-
ing from clerical oversight and omissions of the officer taking the
same, and that it does not apply here for the reason that there is
no proof to show such a defect or omission. But this same argu-
ment was made in the recent case of *Williamson* v. *Lazarus,* 66
Ark. 226, and overruled, on the authority of the decision in *John-
son* v. *Parker,* 51 Ark. 419. In the latter case Chief Justice COCK-
RILL, who delivered the opinion of the court, said that instances of
obvious omissions of words from certificates of acknowledgments
may have given rise to the act in question, but he said that the
terms of the act "are comprehensive, and enunciate a general rule
applicable to all cases in which the acknowledgment is insufficient
to give full legal effect to the terms of the conveyance." These
cases are conclusive of the question here, and show that the ruling
of the circuit judge on this point was correct.

The next question as to whether the trust deed executed by
Dirst to Floyd to secure the debts due from him to the plaintiffs
in this action was void by reason of the fact that Dirst was insane at
the time of its execution is largely a question of fact, the legal
questions involved being well settled. It is unnecessary to set out
the testimony in the record bearing on this point in full. It shows
clearly that Dirst, the grantor in the trust deed, was partially in-
sane, both before and after it was executed. He was subject to
insane delusions on certain subjects. The presence of this form of
insanity in Dirst became first distinctly noticeable in the spring of
1896, some two or three months before the trust deed was executed.
The following circumstances first attracted attention to his malady:
Dirst was the owner of a shepherd dog, to which he seemed much
attached, but about the time referred to, without any sufficient
reason, he became possessed of the idea that the dog was mad, and
killed it. The next day he killed a chicken cock belonging to him,
and, upon being asked why he did so, replied that "it was mad, and
had been chasing him around, and that he was not going to be
killed by a ten-cent rooster." A physician was called in, and found
Dirst laboring under great mental excitement, and possessed with
the delusion that his wife was insane. He said to the physician:
"There is nothing the matter with me, but my wife is crazy." "I
concluded," said the doctor, "that he was a monomaniac on the sub-
ject of his wife's insanity." Ten or twelve days later the physician
saw him again, and found him still laboring under the same nervous

derangement, but not to such an extent as before. Dirst at this time was engaged in the business of a nurseryman, and was also the proprietor of a country newspaper. Though at times afflicted in this way, he continued to look after his business affairs to a limited extent for over a year after the trust deed was executed. But the delusions continued. At times he believed that certain of his former neighbors who had died were not in fact dead, and asserted that they had been buried alive to fool him. He often asserted that events known to have occurred in the neighborhood were only myths. To one of his sons he said on one occasion that the Mountain Echo, the Baxter County Citizen and the Harrison Times were only myths; that no such papers were published, but that a few sample copies had been sent out to fool the people. Haunted at times by these delusions, with signs and symptoms of insanity increasing and accumulating against him, it was nearly three years after the execution of the trust deed before Dirst was finally adjudged to be insane by the county court, and sent to the state asylum for the insane.

The evidence, as we have before stated, makes it very plain that Dirst was afflicted with some form of insanity, but we think it is equally plain that he was only partially insane, and that on some subjects he was rational. This is shown by the testimony of the witnesses introduced to prove his insanity. "On some subjects," said one of them, "he seemed sane, and on others he seemed wild. Railroads and minerals seemed to be his hobby. He seemed crazy on those subjects, but on fruit culture and some other subjects he seemed rational." Two of his sons, who were of age, deposed as witnesses for the defendants to acts of insanity on his part, but both admitted on cross-examination that he was rational on some subjects. "It was owing to the subject of conversation," said one of them. "There were some subjects on which he was rational at all times." Even the testimony of his wife, one of the defendants, shows that he was only partially insane. "He seemed," she said, "rational on some subjects, and irrational on others. As long as we talked on agricultural subjects or mineral outcrops, he seemed rational, but when we talked on the subject of railroads or his neighbors he seemed irrational, and would indulge in wild and unreasonable statements."

The fact that he was only partially insane, and that there were intervals when his mind was rational, is also shown by the

fact that nearly a year after the deed of trust was executed he was still engaged in his nursery business, and in taking orders for the sale of his fruit trees. It is no doubt true that an insane man might, if allowed to do so, undertake to continue the business that he had followed previous to his insanity. The insane physician might endeavor to heal the sick, the insane minister might still try to preach, and so might the insane nurseryman endeavor to carry on his business when his mind was no longer able to comprehend it; but this is not a case of that kind. The testimony of every witness here is that on questions concerning fruit trees and the business of nurseryman Dirst was always sane. It was on other and different subjects that his mind was unbalanced.

Coming now to his conduct on the day the trust deed was executed, the evidence shows that on that day two attorneys, J. C. Floyd and S. W. Woods, who between them represented these creditors, and had the claims for collection, called to see him about the payment thereof. They found Dirst and his young son in the field hoeing corn. He seemed to be in good health and perfectly rational. When they explained to him the object of their visit, Dirst expressed a desire to pay off the indebtedness, and said that he would do so in the future, but that he had no money at that time. Upon their suggesting that he could secure the claims by giving a mortgage, Dirst explained to them that his place had been sold under execution, and that he had not redeemed it. The attorneys then told him that, if he would secure the amount of the execution sale along with the other debts, the lands could be released or redeemed from the execution sale. He replied that he was willing to do so if they would give him time to pay the debts, and upon their offering to give him eighteen months' extension he said that the agreement was satisfactory, and he would go to the house and consult his wife about the matter. They then went to the house, and after consulting with his wife it was agreed by them to execute the trust deed on the terms proposed. The attorneys took dinner with him at his house, and while waiting for dinner to be prepared Dirst helped one of them to feed their horses, and afterwards showed them his garden and some of his fruit trees, and talked with them of the qualities of the different fruits, and on other subjects of that kind in a rational and sane manner. It was just after the nominations for president had been made by the two leading parties, and Dirst discussed with them the merits of the

respective candidates and platforms. Being in favor of what was called the "gold standard," Dirst took that side of the question, and, the witnesses say, supported it by a very intelligent argument, and seemed in perfect control of himself and his mental faculties. The trust deed was prepared in accordance with the agreement of the parties, and after dinner Dirst and his wife and the two attorneys went together to Dodd City, a neighboring village, and the deed was there acknowledged before a notary public. During all the time they were with Dirst, these two witnesses say they saw nothing to indicate mental derangement on his part. He appeared to be perfectly rational on all subjects, and they said that the idea that he was mentally unbalanced in any way never once occurred to them, as his conduct through the whole matter was that of an intelligent and rational man.

These witnesses must, of course, be treated as to some extent interested, but their statements are not contradicted, but are supported by the testimony of the notary public before whom the deed was acknowledged, and by that of another witness, who saw Dirst on that occasion and heard him talk. It is even corroborated by the testimony of Mrs. Dirst, who, though she was permitted to testify for the defendants, did not contradict these witnesses as to the conduct of her husband on that day, and the only reason she gave for believing that he was insane at the time he executed the deed was that when she came to the house he told her that the attorneys wanted her to sign the trust deed, and said to her that she "had better do so," without consulting or explaining the matter to her as he usually did. But men often act in that way, and this did not show that he was insane or ignorant of the nature and consequences of the deed he was about to make. Her testimony shows that at the time she was asked to sign the deed by her husband she understood fully why the trust deed was desired and the history and nature of the claims to be secured. It was therefore apparent that no explanation was needed. Her husband probably knew this, and for that reason made none.

The story of the conversation between herself and husband on the night following the execution of the deed in which he told her not to cry, that Gray, the officer before whom the deed was acknowledged, "was neither a notary or justice of the peace, and had no authority to take the acknowledgment, and it didn't amount to anything,— cannot be considered, for it was a communication from a husband to a wife and was clearly incompetent.

Granting that, as Mrs. Dirst was a party to this suit, and had an interest in the land as a homestead, she could testify in her own behalf, yet still it was not competent for her to testify to communications made by her husband to her as evidence to avoid his deed. Sand. & H. Dig., § 2916. Disregarding such communications. proved by her, we think the evidence shows that Dirst at the time he made the deed was sane, or at least not insane on any subject. connected therewith.

Counsel for plaintiffs say in their brief that the very fact that he was willing to incumber his homestead with such a lien is evidence of insanity on his part. But it is a common occurrence for persons in debt to mortgage their homestead in order to secure the same. A considerable percentage of the homesteads in this city are mortgaged; but, while this indicates that the owners thereof are in debt, it is no evidence of insanity on their part. Besides, it is shown in this case that Dirst, several years before he was. affected with insanity, mortgaged this same homestead to Margaret. Williams for a larger amount than that secured by this trust deed. This mortgage to Mrs. Williams has not been paid, and in the end it may absorb the homestead, and leave little or nothing for the satisfaction of the claims secured by the trust deed. The existence of this prior mortgage on his homestead may account for the willingness of Dirst to give the second one, especially when by giving it he obtained a year and a half extension on his debt. The attorneys who testified said that Dirst expressed a desire to pay the debt, but insisted upon a liberal extension of time in which to pay as the condition upon which he would execute the trust deed. They were compelled to give the extension in order to get the security, and this indicates that Dirst understood the nature and consequences of the contract he was making.

Now, as before stated, the law bearing on this question is not difficult to state. While it may have formerly been the doctrine of the courts that an insane person could do no legal or binding act, that dogma has been long overthrown. The law now recognizes the fact, well established by the investigation and observation of medical experts, that there may be derangement of mind as to particular subjects, and yet capacity to comprehend and intelligently act on other subjects. It follows, therefore, that the proof which is designed to invalidate a man's deed or contract on the ground of insanity must show inability to exercise a reasonable judgment in

regard to the matter involved in the conveyance. The fact that the grantor was a monomaniac, and possessed of insane delusions on some subjects not connected with the conveyance or the matters out of which it grew, is not sufficient to invalidate his deed. To have that effect, the insanity must be such as to disqualify him from intelligently comprehending and acting upon the business affairs out of which the conveyance grew, and to prevent him from understanding the nature and consequences of his act. Buswell, Insanity, § 270; *Burgess* v. *Pollock,* 53 Iowa, 273, 5 N. W. 179, 36 Am. Rep. 218; *Elwood* v. *O'Brien,* 105 Iowa, 239; *Concord* v. *Rumney,* 45 N. H. 428; *Aldrich* v. *Bailey,* 132 N. Y. 85; *Kingsbury* v. *Whitaker,* 32 La. An. 1055, 36 Am. Rep. 278; *Banks* v. *Goodfellow,* L. R. 5 Q. B. 549; Bishop on Contracts (Enlarged Ed.), 962, 964; 16 Am. & Eng. Enc. Law (2d Ed.), 624, and cases cited.

Now, applying these rules to the case in hand, we think the finding must be in favor of the plaintiffs. The burden was on defendants to show that the trust deed was void. But, taking all the evidence together, we think it is reasonably clear that they did not make out a case sufficient to avoid the deed. On the contrary, we believe the decided weight of evidence shows that Dirst, in executing the trust deed, understood very well the nature and consequences of his act. If there had been any fraud or unfairness in the transaction, a different question would have been presented. But the debts secured by the trust deeds were valid and subsisting claims against Dirst. As he owed these debts, and was unable to pay them, it was only natural that he should wish, by securing them, to obtain time in which to pay them. His action in this regard displayed, not insanity, but honesty and good business intelligence. On the whole case, we think the court erred in declaring the trust deed and notes void. The judgment in that respect is therefore reversed, with an order to enter a decree in favor of plaintiffs foreclosing the trust deed, but subject to the prior lien of Margaret Williams. The decree as to her mortgage is affirmed.