First National Bank of Rogers *v.* Tribble.

Opinion delivered October 16, 1922.

1.  INSANE PERSONS—EVIDENCE OF INSANITY.—Evidence *held* to show insanity.

2.  EVIDENCE—OPINIONS OF EXPERTS.—Testimony of physicians concerning the mental condition of a person, based upon personal association with or examination and observation of the person, *held* competent, though not based upon a case hypothetically stated.

3.  EVIDENCE—OPINIONS OF NON-EXPERTS.—Testimony of non-expert witnesses as to a person's mental condition was admissible where they stated the facts and circumstances on which they based their opinions.

4.  PARTNERSHIP—CLAIM OF INDIVIDUAL PARTNER.—Where funds of an insane partner were used to pay for goods which went into the firm's stock, and were sold along with other goods, such partner's estate was entitled to reimbursement *pro rata* with other creditors out of the proceeds of sale of the stock.

5.  INSANE PERSONS—CANCELLATION OF CONTRACTS—RESTITUTION.—Contracts with insane persons are void *ab initio*, and may be canceled without a restoration of the consideration if it has been wasted or dissipated.

6.  CONFUSION OF GOODS—PROPERTY WASTED DURING INSANITY.—Where goods purchased for a partnership by an insane member and paid for by him with his separate money were commingled with the goods of the firm, and were sold at a loss to satisfy the partnership debts, the insane partner was entitled only to share *pro rata* with other creditors of the firm.

7. RECEIVERS—TAXES.—Where, prior to an application for a receiver in insolvency, an attachment was levied by the seller upon specific goods sold to the insolvent, upon which the seller owed taxes, the State's lien for taxes was payable from the amount allowed the attaching seller upon his preferred claim.

Appeal from Benton Chancery Court; *Ben F. Mc-Mahan,* Chancellor; reversed and affirmed.

*Duty & Duty* and *Funk & Funk,* for appellants.

To invalidate the contract of an insane person, his insanity must be such as to disqualify him from intelligently comprehending and acting upon business affairs out of which the contract grew, and to prevent him from understanding the nature and consequences of his act at the particular time the contract was entered into. An insane person who has lucid intervals may enter into binding contracts during those intervals, and may be held liable even in the case of an executory contract, if he comprehended the nature and consequences of his act at the time he entered into such contract. 129 Ark. 88.

Where evidence has been given tending to show the insanity of a person, and other evidence tending to show his sanity, it is not competent to inquire of a medical expert his opinion respecting that person's sanity or insanity, forming his opinion from the facts and circumstances detailed by the other witnesses. He will not be allowed to determine from the testimony of other witnesses what the facts are, and to give his opinion upon them. 82 U. S. 9; 64 Ala. 18; 62 Miss. 409.

The opinion of Sam Tribble as to appellee's insanity was not competent, because the facts and circumstances upon which he based his opinion were not disclosed. 92 Ark. 457; 22 *Id.* 92. Sanity is presumed until the contrary is proved, and the burden was on the defendant to prove his insanity. 27 Ark. 156; 59 *Id.* 246; 4 Elliott on Contracts, 3820.

The chancellor's finding as to the insanity of the defendant at the time the contracts were made with Poindexter & Sons' Merchandise Company, and the borrowing of the money from the two banks, is clearly

against the preponderance of the evidence.   70 Ark. 166; 97 *Id.* 450; 129 *Id.* 88.

The estate of an insane person is liable for debts created by him where it is shown that the creditor acted in good faith without knowledge of the mental incapacity of the debtor, and before any adjudication of insanity was had, where no fraud or undue influence was used in the transactions and the insane person actually received the benefit of such transactions.   19 R. C. L. p. 584, § 40; 81 Ind. 433; 94 *Id.* 535; 23 Ia. 333; 34 Kan. 87; 88 Md. 368; 48 N. H. 133; 140 N. C. 163; 82 Atl. 837, Ann. Cases 1914-D, p. 865; 79 N. Y. 541; 2 Exch. (Eng.) 486; 7 De G. M. & G. (Eng.) 487; 1 Story's Equity, Redf. Ed., §§ 227, 228; 2 Pomeroy, Equity, § 946; Chitty on Contracts, § 3139; Parsons on Contracts, § 312.

The contract of an insane person, where he has conveyed real estate and spent the consideration and has no means of returning it, ought not to be placed in the same class with the contract of an insane person which does not involve a conveyance of real estate, but under which he has obtained money and personal property. whose estate is sufficient to place the other part *in statu quo.*   Under such an executed contract it would be derogatory alike of sound law and good morals to allow the insane person to retain the consideration to swell the *corpus* of his estate.   85 Vt. 488; Ann. Cas. 1914-D, p. 869; 38 N. J. 536; 97 Tenn. 120, 36 S. W. 716; 78 Pa. St. 407; 65 Ala. 98; 112 Ala. 465; 85 Ill. 62.

*John W. Nance* and *Lee Seamster,* for appellee.

If there was any error at all in the finding of the chancellor with reference to appellee's insanity, it was in finding that he was not of unsound mind prior to the time he located at Rogers.

Conceding that an insane person may make a valid contract during a lucid interval, there is no testimony that appellee made either of the contracts sued upon during a lucid interval, no testimony offered to show that

he was sane at any time during the progress of these transactions.

Appellant's authorities on the proposition that the opinions of expert witnesses must be based on questions hypothetically stated were not necessary; they have no application here, since none of the witnesses attempted to testify as experts. Their testimony must be classed as non-expert, and, since they detailed the specific facts upon which their opinions were based, their testimony was competent and admissible. 103 Ark. 200; 61 *Id.* 245; 97 *Id.* 457; 22 *Id.* 92.

It is true that every person is presumed to be sane until the contrary is shown; but it is also true that where one's insanity has once been established by proof, he is presumed to continue of unsound mind until the contrary is shown, and in this case the burden was on the plaintiffs to establish the defendant's sanity by a preponderance of the evidence, and to show that he executed the contracts during lucid intervals. 14 R. C. L. 622; 4 A. & E. Ann. Cas. 490, 491.

Under the law as construed by this court an insane person's estate cannot be held liable for his debts incurred and contracted when he was insane. 148 Ark. 249; 129 *Id.* 88; 23 *Id.* 417.

The State's lien for taxes had attached before Tribble purchased the McGinty stock of goods, and McGinty had become personally liable, and that lien was not affected by the failure of the receiver to pay the taxes. The goods could be followed by the State for the purpose of enforcing its lien for taxes into whosesoever hands they might be found. 46 Ark. 73.

HUMPHREYS, J. This is an appeal from a decree of the chancery court of Benton County involving the validity of loans made to A. L. Tribble by the First National Bank on Jan. 18, 26, and Feb. 2, 1921, in the respective sums of $2,000, $1,000, and $5,000, and by the American National Bank on Jan. 28 and Feb. 1, 1921, in the respective sums of $750 and $503; and of the purchase of a large bill of goods from H. D. Poindexter & Sons'

Merchandise Co. Jan. 26th of the same year. The First National Bank filed suit on Feb. 5, 1921, against A. L. Tribble, doing business under the firm name of Rogers Mercantile Co., and A. L. Tribble and G. Flanigan, doing business under the firm name of Tribble & Flanigan, alleging that it was a large creditor of the firms; that said firms and the members thereof were insolvent, and that, through the gross mismanagement and waste of A. L. Tribble, the assets of the respective firms were being rapidly dissipated. The prayer of the bill was for the appointment of a receiver to take charge of the assets of the firms and apply the proceeds thereof to the payment of its claim. Prior to the application for a receiver, E. A. McGinty had instituted and levied a specific attachment upon the stock of goods sold by him to A. L. Tribble for the balance of the purchase money due thereon. Other creditors, including the State of Arkansas for the use of Benton County to collect taxes on the McGinty stock, intervened, and a receiver was appointed, who took charge of the assets belonging to both firms, including the McGinty stock. The receiver, by order of the court, sold the several stocks of goods separately. The stock of goods purchased by Tribble from E. A. McGinty, and operated in the name of Rogers Mercantile Co., brought $3,765.13; the new stock purchased for the latter firm brought $8,216.12, and the Tribble & Flanigan stock brought $2,909.49.

A guardian was appointed by the probate court for A. L. Tribble, who intervened and attacked the validity of the claims of the creditors, on the ground that his ward was insane at the time he borrowed the money and purchased the goods.

The cause was submitted to the court upon the pleadings and testimony, which resulted in the following findings: That A. L. Tribble was competent to transact business on Oct. 18, 1921, when he borrowed $1,800 from the First National Bank, which went into the business of Tribble & Flanigan; but that he became insane soon thereafter, and was insane when he borrowed the other

moneys from said banks and purchased the McGinty stock and other goods; that the moneys borrowed from both banks, including an overdraft of $444.54 in the First National Bank, were used in the purchase of the McGinty stock and other goods for the firms owned and operated by A. L. Tribble; that A. L. Tribble invested $4,064.90 in cash out of his separate estate in the Rogers Mercantile Co.; and that, on account of the disability of A. L. Tribble, appellants were not entitled to recover .out of Tribble's separate estate, on their claims growing out of contracts entered into with him after October, 1921; but were entitled to participate *pro rata,* according to the several amounts of their claims, out of the proceeds of the sale of the goods of the Rogers Mercantile Company, after paying McGinty's claim, the taxes on the McGinty stock, and A. L. Tribble's individual investment of $4,064.90 in the company; that the First National Bank was entitled to recover $1,800, which it loaned Tribble on the 18th day of October, 1921, and which was included in the renewal note of $2,000 in January, 1922, out of the proceeds of the sale of the Tribble & Flanigan stock. A decree was rendered in accordance with the aforesaid findings.

Appellant's first contention for reversal is, that the court erred in finding that appellant was insane at the time he purchased the goods and borrowed all the moneys except the amount of $1,800. The record reveals that as early as March, 1921, Tribble was under treatment of Dr. Kitchens, a physician of DeQueen, for mental trouble; that he was taken to Dr. J. L. Green of Hot Springs, a specialist, who discovered that he was suffering from a depressed phase of manic-depressive insanity, which disease, according to the testimony of the expert, in both its first and second stages, incapacitated him for intelligently transacting business. He returned to his home, but was taken a second time to Dr. Green for treatment. Dr. Green was out of Hot Springs, so he was treated by one of Dr. Green's assistants. During the month of February, 1921, just after the receiver was appointed, he

was again taken to Dr. Green for examination, who advised that he be taken to the insane asylum for treatment. The expert described the second stage of Tribble's disease as the period of exaltation, saying that the evidence of it was over-activity of mind, the disease leading him to do unreasonable things, such as acquiring unreasonable obligations. Tribble was a candidate for sheriff of Sevier County in the summer of 1920, and was defeated by a small vote. After his defeat he moved to Rogers, hoping that the climate would improve his mental condition. He purchased a small grocery business and conducted it under the name of Tribble & Flanigan. Flanigan only had a working interest in the firm. On the 18th of October, 1920, Tribble borrowed $1,800 from the First National Bank, which was put in the business. On January 18, 1921, he borrowed $2,000 from the First National Bank out of which he paid the $1,800 note he had given in October. He then decided to add a small stock of dry goods to his grocery stock, and, after informing W. R. Daly, his family, and the bank of his intention, he went to Kansas City to purchase the dry goods. On January 20, 1921 a collection of $4,064.90 was made for him by the First National Bank on a note against Texas parties, and was that day placed to his credit in the bank. He was in Kansas City at the time, where he had gone to buy goods. While there he purchased goods to the amount of about $10,000 and gave a check for $3,500 in part payment thereof, on his account in the First National Bank. At the time of the purchase he had no place to put the goods or money to pay for the rest of them. He came home, and on January 26th borrowed an additional $1,000 from the First National Bank, and on January 28th he borrowed $1,303.69 from the American National Bank. He then purchased the McGinty stock of groceries, which invoiced over $6,000, and contracted for the building in which the McGinty stock was located for $10,000. On February 1st he borrowed $5,000 from the First National Bank, $4,000 of which amount was used in

part payment of the McGinty stock. Early in February he tried to borrow $5,000 more from the American National Bank to pay on the Kefauver brick building, for which he had contracted, but it declined to make the loan. He made extensive improvements on the brick building he purchased before making arrangements to pay for it. He occupied the home of his sister-in-law, and, without her consent, built a large basement under it for the purpose of putting in a heating plant, and contracted for other substantial improvements on it. He was residing next door to Dr. W. A. Moore, who testified that Tribble spent much time with him in the evenings; that in December Tribble abruptly informed him that he was going to build a concrete road across his (the doctor's) back yard over to his outbuildings so he could wash his car; that Tribble was nervous and abnormal in conversation; that he planned to build a $100,000 hotel, and talked about it a great deal, when he had no capital with which to build it; that he became convinced in December, from his conversation, that he was mentally wrong, and gave it as his opinion that during the months of December, 1920, and January, 1921, he was mentally deranged and unable to exercise a reasonable judgment in business affairs. On February 3rd Tribble called on the First National Bank and tried to borrow eight or ten thousand dollars more, and when refused became boisterous and showed evidence of insanity. After consultation, the president and cashier of the bank notified his brother and requested him to come to Rogers. When he came and investigated his brother's condition, it was agreed that the bank should make application for a receiver to take charge of the assets of both firms, to prevent waste and protect the creditors. During the negotiation of the loans and the various purchases of the goods Tribble appeared to be normal. No evidences of insanity were observed by the officials of the banks or the parties from whom he purchased goods. The banks loaned him money on the strength of very flattering reports and recommenda-

tions received from bank officials at Lockesburg and De-
Queen. The loans and sales of goods were made to him
believing, in good faith, that he was sane. Immediately
after his condition was discovered he was taken to Little.
Rock, and before he was committed to the asylum for
treatment he called on the Doyle-Kidd Dry Goods Com-
pany, made a financial statement showing that he had a
capital of $150,000, bought $5,000 worth of goods in the
piece department, a large quantity of overalls and work
shirts in the furnishing department, and several thousand
dollars' worth in the silk department. He handed the
company a check for $500 and ordered the goods shipped
C. O. D. They took his. check, at his wife's suggestion,
for the purpose of humoring him.

Learned counsel for appellants argue that all the
business transactions of appellant, from the time he lo-
cated in Rogers until he attempted to borrow an addi-
tional eight or ten thousand dollars from the First Na-
tional Bank, were normal in character and judiciously
made, evidencing within themselves that Tribble fully
comprehended the nature and consequences of his acts.
We cannot concur in this conclusion. It does appear that
he conducted the first business in which he engaged in a
conservative and careful manner for a few months, but all
of a sudden, and contrary to the plans divulged to the
bank and his family, he borrowed and bought far beyond
his ability to pay. Through the sudden adoption of an
unsound business policy, to buy large bills of goods with-
out money to pay for them or a place to put them, and
in an attempt to obtain both, he successfully wrecked,
within a few days, the business he owned and the one he
purchased from McGinty. His reckless conduct indicated
very clearly that he was in the second stage of mental
derangement described by. Dr. Green, which impelled him
to acquire unreasonable obligations. Again, it is argued
that the opinions of the physicians as to the insanity
of Tribble were not based upon a case hypothetically
stated, and for that reason are incompetent and worth-

less. As we understand the record, the opinions of the three experts who testified were based upon personal association with, or examinations and observations of, Tribble. Two of them treated him for insanity. It is also argued that the lay witnesses who testified to his insanity did not testify to the facts and circumstances upon which they based their opinion. Morgan Price, one of the lay witnesses whose acquaintance with him was intimate, testified that he based his opinion upon the fact that he was nervous, unusually short and abrupt in conversation, and talkative about big deals. Sam Tribble, another lay witness, a brother of A. L. Tribble, testified that during the winter of 1918 and 1919 his brother had an attack of the "flu," which affected his mind; that he placed him under the treatment of a specialist in March, 1920; that after his return from Hot Springs in July of the same year his mental condition grew worse; that in October he located in Rogers, hoping that the climate there would benefit him; that he visited him at Rogers four times between November 1, 1920, and February 1, 1921, and discovered that he was nervous all the time and talked at random; that he conceived the notion of building a big hotel in Rogers, and in January, 1921, he began to buy goods in a reckless manner. These excerpts, taken from the testimony of the two lay witnesses best qualified by intimate association to testify, disclosed that they detailed substantial facts and circumstances upon which to base their opinions.

Appellants' next contention for reversal is, that the finding of the court to the effect that Tribble had $4,064.90 of his own personal money in the Rogers Mercantile Company, was clearly against the preponderance of evidence. We think otherwise. On January 20, 1921, the First National Bank collected that particular amount for him and placed it to his credit. Two days before that he had borrowed $2,000 from the bank with which to pay the $1,800 note he had given it on October 18, 1920. On the same day the collection was placed to his credit,

to-wit, January 20, 1921, the bank wired H. T. Poindexter & Sons' Mdse. Co. that his check was good for $3,500. The check was given for that amount in part payment of a large bill of goods that day purchased by him from said company. As soon as he returned he had to borrow from the bank again, and overchecked his account in paying for the goods more than $400. We think the irresistible inference is that his individual money, to the amount of $4,064.90, was used to pay for goods which were purchased for the Rogers Mercantile Company. The finding is supported by a preponderance of evidence.

Appellants' next contention for reversal is, that notwithstanding the insanity of Tribble at the time he borrowed the money and purchased the goods, the court erred in refusing to charge his personal estate with the payment thereof. In support of this contention appellant cites cases holding that the estate of an insane person is liable for debts created by him upon contracts partially or wholly executed, if he received the benefit thereof, and was fairly dealt with by the creditor, without notice of his infirmity, and before an adjudication of insanity. This court, however, is committed to the doctrine that all contracts with insane persons are void *ab initio* and may be canceled without a restoration of the consideration if it has been wasted or dissipated. *Henry* v. *Fine,* 23 Ark. 417; *Seawel* v. *Dirst,* 70 Ark. 166; *Reaves* v. *Davidson,* 129 Ark. 88; *Hudson* v. *Union & Merc. Trust Co.,* 148 Ark. 249. It appears from the record, however, in the instant case, that the court in the distribution of the assets of the Rogers Mercantile Company allowed Tribble full value of the goods he purchased and commingled with the general stock. Had the goods had been intact and separable, it would have been proper to return them to his guardian. But they were intermingled and not separable. The stock as a whole was greatly depreciated in value and sold at a loss. It was impossible to apportion the waste or depreciation of any particular goods. Under these circumstances it

was inequitable to require the creditors to bear the depreciation of or loss on Tribble's individual goods. It was proper to allow his claim, but no preference in the apportionment should have been accorded to him. He should have shared *pro rata* in the distribution with other creditors, thereby requiring him to stand the loss or depreciation in value on his goods..

Appellants' last insistence for reversal is, that the court erroneously allowed the State's claim for taxes against the McGinty stock. The State had the first and paramount lien on the stock for taxes. Sec. 10023, Crawford & Moses' Digest. The payment should have been made out of amount ordered paid to McGinty, as it was his duty to pay the taxes on the stock he sold to Tribble, but no objection was made or appeal taken from the priority declared in his favor.

The decree is affirmed in all particulars except the preference given A. L. Tribble in apportioning the proceeds derived from the sale of the assets of the Rogers Mercantile Company. In that particular it is reversed, and remanded for *pro rata* distribution with the other creditors.