OLIPHANT *v.* OLIPHANT.

4-9206                                    230 S. W. 2d 653

Opinion delivered June 12, 1950.

*Linus A. Williams,* for appellant.

*W. J. Morrow,* for appellee.

ED. F. McFADDIN, Justice. Appellants (brother and sister) instituted this suit to set aside two deeds executed by their father, F. M. Oliphant, to their brother, E. E. Oliphant, the appellee. It was alleged that F. M. Oliphant lacked sufficient mental capacity to execute the deeds, and that they were obtained by undue influence. In defense to the suit, the appellee claimed that F. M. Oliphant possessed sufficient mental capacity, and that the deeds were executed in consideration of care, support, and payment of indebtedness. One deed, conveying 60 acres, was dated and acknowledged on March 11, 1935, and recorded on September 30, 1936. The second deed, conveying 40 acres, was dated and acknowledged on December 17, 1938, and recorded on January 19, 1939.[1]

The evidence at the trial[2] disclosed that except for a few short intervals, F. M. Oliphant lived with his son, E. E. Oliphant, from 1934 until January 21, 1939, the date of F. M. Oliphant's death. The appellants visited their father at extremely infrequent intervals during these years; and E. E. Oliphant and his wife had the entire care of F. M. Oliphant who was 78 years of age at the time of his death. There is no direct evidence of undue influence; but appellants claim that the undue influence was shown by the mental weakness of F. M. Oliphant, together with the fact that he deeded all his property to E. E. Oliphant to the exclusion of the appellants.

The real issue in the case, therefore, is the mental condition of F. M. Oliphant at the time he executed the deeds in 1935 and 1938. In *Bilyeu* v. *Wood,* 169 Ark.

[1] This deed was signed by mark; but such is allowed by § 27-109, Ark. Stats. 1947; and the unwitnessed mark may be proven even by the grantee. See *Dawkins* v. *Pettys,* 121 Ark. 498, 181 S. W. 901, and cases there cited.

[2] Although this case was filed October 5, 1939, it was not tried in the Chancery Court until September 13, 1949. Explanation for the delay is immaterial to the controversy.

1181, 278 S. W. 48, Mr. Justice HART stated the applicable rule:

"To invalidate a deed on the ground of the grantor's mental incapacity, the proof must show that the grantor was incapacitated from intelligently comprehending and acting upon the affair out of which the transaction grew, and that he did not intelligently understand and comprehend the nature and consequences of his act. . . . *Kelly's Heirs* v. *McGuire,* 15 Ark. 555; *Pulaski County* v. *Hill,* 97 Ark. 450, 134 S. W. 973; *McEvoy* v. *Tucker,* 115 Ark. 430, 171 S. W. 888; and *Reaves* v. *Davidson,* 129 Ark. 88, 195 S. W. 15." See, also, *Culling* v. *Webb,* 208 Ark. 631, 187 S. W. 2d 173, and *Braswell* v. *Brandon,* 208 Ark. 174, 185 S. W. 2d 271.

The burden was on the appellants, as plaintiffs, to establish F. M. Oliphant's mental incapacity; and to sustain that burden, they offered the testimony of themselves and three others. Some of these witnesses had not seen F. M. Oliphant for several years prior to his death, but testified that with advance in age his mental condition could not have improved over what it was the last time such witnesses observed him. On the other hand, appellee offered the testimony of six witnesses, in addition to that of himself and his wife. We are impressed by the testimony of Dr. Pillstrom, who treated F. M. Oliphant for several years immediately prior to his demise:

"Q. Just state, Doctor, what his mental condition was at the time you treated him during his last illness?

"A. Well, I would say he was sane, he had a heart condition and a kidney condition that was giving him trouble but it didn't seem to affect his mental condition.

"Q. Doctor, was his condition such, at that time, that he was mentally capable of disposing of his property and making a contract?

"A. Yes, I would say it was."

Furthermore, Otis Gould, son of one of the appellants, testified as to F. M. Oliphant's mental condition:

"Q. Just state from your observation of Mr. Oliphant during the time you lived there and during the times you visited in the home up until the time of his death, whether or not his mind was sufficient that he knew the consequences of his acts?

"A. I think so.

"Q. Do you think his mind was sound at that time?

"A. I think it was.

"Q. And during the times you visited there?

"A. Yes."

It would unduly lengthen this opinion to detail all of the testimony. The learned Chancellor held that the evidence offered by the plaintiffs failed to establish the mental incapacity of F. M. Oliphant; and with that holding we agree. Certainly we cannot say that the finding of the Chancery Court is against the clear preponderance of the evidence.

Affirmed.