FIKES *v.* LEE.

5-698                                                   280 S. W. 2d 230

Opinion delivered June 13, 1955.

*Frank J. Wills,* for appellant.

*George W. Shepherd* and *John W. Bailey,* for appellee.

WARD, J.   This suit was instituted to cancel a deed on the grounds that the grantor lacked the necessary mental capacity and that the grantee, having knowledge of the grantor's mental condition, exercised over persuasion, fraud, duress and undue influence.   The trial court decreed a cancellation on the ground of lack of mental capacity, hence this appeal.

*Background facts.*   Henry Hamilton, a negro 86 years of age at the time he made the deed in question, held legal title to real property in North Little Rock described as Lots 5, 6, 7 and 8, Block 5, Foraker Grove Addition which he had owned for several years.   There was a seven room residence on one of the lots in which Hamilton lived and there was a small rent house on each of the other three lots.   The value of this property is estimated at from $3,000 to $9,000.   On June 14, 1954 Hamilton, for a consideration of $3,000 paid in cash, executed and delivered to appellant Dick Fikes [and his wife] a regular warranty deed to all of said property.   On June 23, 1954 Croteal Lee, a daughter of Hamilton, was legally appointed his guardian and on the same day filed a complaint to have the said deed canceled.

*Appellee's testimony.*   The record reflects the following testimony, in substance, to establish Hamilton's lack of mental capacity.   Dr. N. T. Hollis, a licensed physician since 1935, served on the staff of the State Hospital until 1947 when he entered the private practice of psychiatry in which field he has specialized for 19 years.   He examined Hamilton physically and psychiatrically on June 29 and July 1, 1954 when he also talked to two of Hamilton's daughters.   He found Hamilton to be

86 years old, suffering from hypertension, almost blind, hearing affected, mentally confused, and senile, and it was his opinion that this condition developed gradually over a period of years. In his opinion Hamilton was mentally incompetent on June 14, 1954 to fully understand a transaction involving the sale of real estate, its value, or to execute a deed conveying the same. On cross examination he stated that his examination lasted about a half hour on each occasion; that Hamilton showed confusion and uncertainty on many scores although he knew the names of all of his children and where they were located; and he based his opinion partially on the ground that Hamilton is obviously senile and physically crippled.

Dr. A. C. Kolb, 68 has engaged in the practice of medicine and psychiatry since 1917 and has served as superintendent of the Arkansas State Hospital for several years. He has also been employed by the Veterans Administration in the department of psychiatry and was Chief of the Neuropsychiatric unit of the Medical Division until April 1, 1954, and is certified by the medical board of neurology and psychiatry. He examined Hamilton on October 7, 1954 when he obtained a thorough case history after talking to Hamilton and several members of his family. From this he learned that Hamilton had quit work in January 1954 because his eyesight was not good and because he could not work as efficiently as he had in the past; that his wife died in May 1954 since which time he had become depressed and had drunk considerable liquor—something like one pint a day, and; his arteries were hard and tortuous with ringlike formations that could be felt, indicating very marked arteriosclerosis. He made a diagnosis of generalized arteriosclerosis which affected Hamilton's brain and his judgment in conducting business affairs. The doctor also stated Hamilton had a marked mental enfeeblement, secondary only to arteriosclerosis and he didn't think he had the capacity to make the deed on June 14. On cross examination the doctor stated that if you could see Hamilton's brain it would be very much sunken due to lack of nourishment.

Some 8 or 10 witnesses, including the County Judge and contractors for whom Hamilton had worked on previous occasions, testified in substance that Hamilton began to fail rapidly about 18 months previously and that while he was working he would often have to stop and sometimes he would forget to go to work; that he was forgetful and sometimes failed to recognize people whom he knew well; that for 4 or 5 years his wife had attended to most of the business; that since the death of his wife and up until the deed was executed he drank as much as a pint or more of liquor a day, and; that he was apparently worried and morose. Judge Campbell stated that Hamilton had worked for him for many years and that he had never known him to drink during that time but that he saw him about the first of June 1954 and knew he had been drinking and could see "his old friend was slipping"; and that he saw him later in June or July and his mental and physical condition was still about the same. Ben Hogan, a general contractor, for whom Hamilton had worked, saw him shortly before the trial and he noticed that he tottered and seemed very feeble and his statements were not coherent, certainly not comparable to what they were years ago. Two real estate men after carefully inspecting the property estimated it to be worth approximately $9,000.

*Appellants' testimony* was substantially as follows: Dr. Elizabeth Fletcher, a graduate of Arkansas School of Medicine in 1934, and at present engaged in the private practice of psychiatry, examined Hamilton on September 20, 1954. She found evidence of generalized arteriosclerosis and a white ring about the eyeballs called arcus senilis; he weighed 123 pounds, shoulders stooped and bent, oral hygiene poor, and eyesight impaired, with no indication of cardiac decomposition. In her opinion his physical condition does not affect his mental capacity. He was quiet, agreeable and cooperative, she found no unusual mannerisms and no evidence of delusions or hallucinations and, in her opinion, he knew what he was doing when he signed the deed and knew the consequences of his act. On cross examination she stated that arcus senilis is indicative of hardening of the arteries. She

also found a white ring completely around the iris of his eyes, his heart somewhat enlarged as was to be expected, a loud systolic murmur indicating an ortic insufficiency, but he gave no evidence of lack of blood supply to the brain. She found that he was bright and smart and could evaluate the sale of a piece of land as well as the average person. Hamilton left the impression on her that he had made a mistake in selling the land but since he had agreed to the transaction he ought to suffer the consequences.

Fikes stated that Hamilton first asked him $3,500 for the property and that later he agreed to take $3,000; that after his attorney had examined the abstract, which had not been brought up to date, he gave Hamilton three One Thousand Dollar bills and that Hamilton's daughter gave him a receipt; and, that later on the same day he went back when Hamilton signed the deed. In his opinion the property was not worth more than $3,000 and there was nothing in Hamilton's appearance to indicate that he had been drinking or that he did not fully understand what he was doing. Under their agreement Hamilton was to get one month's free rent and after that he was to pay $30 a month rent to live in the main house. Two real estate men estimated the value of the property to be around $3,500. There was testimony that Hamilton did not drink after his wife's death and that his mind was not affected.

It was shown by the testimony for both sides that at about the time the deed was executed Hamilton contracted for lumber to the extent of $178.95 in order to repair a house nearby which did not belong to him, and that a few days later the lumber was returned and he was refunded the $100 which he had made as a down payment.

In the words of appellants "the sole question (for us to decide) is the adequacy of the evidence to support the chancellor's finding that Hamilton did not realize the effect, result or import of his acts in selling the property." In the beginning, however, it is necessary to set forth the correct rule by which we are to be guided. Appellants start their argument with the statement that "the proof of incompetency must rise above a prepon-

derance and must be clear, cogent and convincing to justify setting the deed aside''. In this statement of the rule appellants are in error, and they are not sustained by *Braswell* v. *Brandon,* 208 Ark. 174, 185 S. W. 2d 271, which they cite. There the ''preponderance rule'' was stated at page 176 [Arkansas Reports]. The *Braswell* opinion does however cite *Stephens* v. *Keener,* 199 Ark. 1051, 137 S. W. 2d 253, as sustaining the ''clear, cogent, and convincing rule'', but in that case there was no question of mental capacity involved. The correct rule by which we are to be guided in this kind of a case is, as stated in *McEvoy* v. *Tucker,* 115 Ark. 430, 171 S. W. 888, and *Oliphant* v. *Oliphant,* 217 Ark. 446, 230 S. W. 2d 653, whether or not the chancellor's finding is contrary to the preponderance of the evidence.

The definition of what constitutes mental capacity to execute a deed has been stated in varying language by many decisions of this court. Perhaps the language most uniformly approved by our decisions is that set forth in *Seawel* v. *Dirst,* 70 Ark. 166, 66 S. W. 1058, *McEvoy* v. *Tucker,* supra, and *Beaty* v. *Swift,* 123 Ark. 166, 184 S.W. 442, to the effect that proof which is designed to invalidate a person's deed or contract on the ground of insanity must show inability to exercise reasonable judgment in regard to the transaction involved, and it must be such as to disqualify him from intelligently comprehending and acting upon the business affairs out of which the conveyance grew, and to prevent him from understanding the nature and consequences of his act.

Guided by these rules we are unable to say that the trial court's finding in this case was against the preponderance of the evidence.

At the outset we cannot help but be impressed by the qualifications and testimony of the two psychiatrists who, after careful examinations, concluded that Hamilton lacked the necessary mental capacity to execute the deed to appellants. This specialized testimony was corroborated by the lay testimony of several individuals, some interested and some apparently disinterested, who had

the opportunity to observe Hamilton and to compare his physical and mental condition at the time the deed was executed with his condition at prior times. We cannot say that the chancellor was wrong in being more impressed by this testimony than he was by the testimony of the one psychiatrist and other individuals who were of the opinion that Hamilton did have sufficient mental capacity at the time he executed the deed on June 14, 1954 to understand the nature and consequences of his **act.**

There are some other circumstances in the case which confirm the view we take. Although the price paid for the property by appellants is not shown by the evidence to be so inadequate as to shock the conscience or to be conclusive of the lack of mental capacity on the part of Hamilton, yet the chancellor may well have found it was worth considerably more than $3,000, and, if so, was a circumstance which the chancellor had the right to take into consideration in his over-all view of the case. In *McEvoy* v. *Tucker,* supra, the court said: ". . .we think the evidence in this case shows an inadequate consideration, and that is a circumstance to be considered in determining whether relief shall be granted in cases of this character, for if, in addition to mental incapacity, there is also inadequacy of consideration, equity will the more readily intervene to set aside a conveyance".

While we agree with the chancellor that there is nothing in the testimony in this case to show that Fikes' conduct in dealing with Hamilton amounted to fraud or deception, yet there is one incident of such significance as to evoke comment by Dr. Kolb which may properly be mentioned. The testimony shows that before the abstract of title had been brought up to date and before the deed in question had been executed appellant Fikes went to Hamilton's home and offered him three One Thousand Dollar bills for the property, and that Hamilton accepted them with apparent relish. Not only was this procedure on the part of Fikes somewhat unusual, but Dr. Kolb thought it was calculated to produce a psychological effect on Hamilton. The doctor stated it was **his frank**

opinion that Fikes recognized Hamilton's mental enfeeblement and used the One Thousand Dollar bills as a psychological wedge, and that it worked. Mention is made of this merely because we think it might well have impressed the chancellor as it did the doctor.

Accordingly, the decree of the trial court is affirmed.