1098

Foster *v.* Howell.

5-1495                                      313 S. W. 2d 81

Opinion delivered April 28, 1958.

[Rehearing denied June 2, 1958]

*Kenneth Coffelt,* for appellant.

*Fred Newth* and *Robert J. Brown,* for appellee.

Carleton Harris, Chief Justice.  This appeal is from a decree of the Pulaski Chancery Court (2nd Division), dated July 16, 1957, cancelling a deed from one Lucy Bennett to appellant, Lillie Belle Foster, the Court finding that "Lucy Bennett is now, and was on the 24th day of April, 1956, senile and incompetent both mentally and physically to carry on her business and manage her affairs; and, the Court doth further find that the consideration mentioned in the deed of the 24th day of April, 1956, was inadequate and has not been paid, and, that the said deed should be cancelled."

Lucy Bennett, around 80 years of age,[1] lived at 3100 Louisiana Street in Little Rock, which property she owned as the survivor of an estate by the entirety, following the death of her husband.  Her daughter, Lucille Bennett Howell, lived with her.  On December 9, 1955, Lucy Bennett left her home and went to the home of Lillie Belle Foster, who lived across the street from the Bennett home, claiming that her daughter, Lucille Bennett Howell, appellee herein, was mean to her and would

---

[1] Lucy Bennett testified she was 84. Lucille Bennett Howell, the daughter, testified that her mother was between 75 and 80.

beat her. According to the evidence, the Fosters notified appellee that her mother was there, but the daughter never did take her home. Lucy Bennett continued to stay with Lillie Belle Foster and her husband, James Foster. On April 24, 1956, Lucy Bennett executed a deed conveying her home property to Lillie Belle Foster, and on December 17th of the same year, Lucille Bennett Howell filed a petition in the Probate Court alleging the incompetency of her mother and asking to be appointed guardian. The matter was heard on January 17, 1957, and the court appointed appellee guardian for her mother.[2] The instant suit to cancel the deed was filed on February 12, 1957, by Lucille Bennett Howell, guardian, and it was stipulated between the parties that the record in the guardianship hearing might be considered as evidence in this case. In fact, the evidence adduced at the guardianship hearing comprises the entire record in this case, except for additional testimony by Dr. Elizabeth Fletcher.

There are only two questions in this litigation; first, whether Lucy Bennett was mentally competent to execute the deed of April 24, 1956, and second, whether the consideration was adequate.

More often, suits of this nature are commenced and heard after the death of the grantor. Here, the grantor was living[3] at the time of both trials, and appeared in court and testified during the proceedings to determine whether the daughter should be appointed guardian. Her testimony largely related to the execution of the deed to appellant, and the mother's reasons for deeding away her home. At the time of this hearing, Lucy Bennett had been living with the Fosters for over 13 months, and the deed had been executed nearly 9 months previously. She testified that she went to the Fosters because her daughter was mean to her, was "fighting" her all the time, and "would go off and get drunk and come back and beat me. And I just left." She stated that her daughter beat her with a washboard and wash

---

[2] Lucy Bennett appealed to this Court, and the transcript was lodged. The appeal was subsequently abandoned.

[3] Lucy Bennett died on November 14, 1957.

sticks, and that such treatment had gone on for some time. The testimony about the beatings was corroborated by two apparently disinterested neighbors, as well as by appellant. From the testimony of Everlena Bell, a neighbor:

"Q. Do you know about the way her daughter beat her up?

A. Yes, she was beat up so until her hands was just drawed up like this and from here down until the end of her feet was swelled this way and she could not walk. I rubbed her with liniment.

Q. Is that the general reputation?

A. Yes, beating up her mother and putting her out doors in the cold, and she sat out there the coldest day it was in December with nothing around her hands and head."

She further testified that Lucy was happy, and well cared for by the Fosters, and that in her opinion, Lucy Bennett had "good sense" and "knows what she is doing." Another neighbor, Hattie May Murphy, who lived next door, testified:

"I stayed next door to her and my husband and I know she has beat her mother quite often and we used to wake up at night and go to the window and listen." She testified that this occurred "A number of times. I don't know exactly how many times." She also stated that she had gone over to the Bennett home at the request of Lucy Bennett and washed dirty clothes for Lucy. While it is true that the alleged beatings and mistreatment have nothing to do with whether Lucy Bennett was competent or incompetent, we think such testimony pertinent as showing a reason for her desire to live with somebody else. Under ordinary conditions, a mother would normally leave her property to her children, but under the conditions testified about, a parent might well otherwise dispose of her property, particularly if by so doing, she could move into happier surroundings. When asked if she worked out an agreement to live with the Fosters, Lucy Bennett replied:

"Well, I told them if they would take me and do the best they could for me, I'd give them that home.

Q. Was that as long as you lived?

A. Yes.

Q. Was that your proposition that you made to them?

A. Yes.

\* \* \*

Q. You went over there fifteen months ago. Have you been there ever since then?

A. Yes.

Q. Do they take care of you?

A. Do all they can for me.

Q. Do you want for anything at all?

A. No, I don't want for nothing.

Q. And they treat you good do they?

A. Yes.

Q. And you deeded them this place for them to take care of you as long as you live?

A. Yes.

Q. Did you know what you were doing when you did that?

A. Why sure."

Both the Fosters testified that Lucy Bennett came to their home of her own accord; that the daughter was notified to come and get her, but did not do so. James Foster testified that he called appellee and told her to come and get her mother and appellee replied:

" 'I will be over and get her as soon as I get dressed.' Well, she never did get there somehow or other. She went off that day and left her house open. I called her again. She said, 'I left that door open for her to come in.' She said, 'Put her out.' I said, 'I

can't do that. You come get her. I don't have time to fool with her.' "

There is absolutely no evidence that the Fosters induced Lucy Bennett to come to their home or used any undue influence or persuasion in obtaining the deed; nor did Lucille Bennett Howell seem to evidence any concern over her mother leaving the home and moving in with the Fosters, or but little interest in the welfare of her mother, until she learned about the execution of the deed, which was several months later. In conflict with the testimony of the aforementioned witnesses was the testimony of appellee herself, who testified her mother had been "acting awful queer" for 20 years. She testified that she and her mother had mortgaged the home to the Worthen Bank for $410 in order to obtain money for improvements . . . that she had paid the greater part of this indebtedness, having made all monthly payments of $11.40, following Lucy Bennett's departure from the home, although part of the earlier payments had been made from welfare checks[4] received by the mother. She stated that neighbors cashed her mother's welfare checks and that children in the neighborhood would talk her out of her money . . . that her mother would go off and leave the house open, and on one occasion locked herself out and came in the window . . . she wandered down to the neighbors on some occasions and would stay a night or two . . . "anybody that would sell her home for $300, whole house and lot" is incompetent. When asked: "Q. Would you say your mother is senile? A. I think so. Q. You think she is not mentally competent? A. She is not at herself. I think so." This testimony pretty well summarizes her reasons for considering her mother mentally incompetent, and obviously does not constitute potent evidence for the purpose of establishing incompetency. The only other witness for appellee was Dr. Elizabeth Fletcher of Little Rock, who testified in both the Probate and Chancery hearings. Dr. Fletcher examined Lucy Bennett at the home of the Fosters on September 24, 1956

---

[4] The welfare checks ceased a few months after Lucy Bennett moved to the Fosters.

. . . the examination consisted of talking with the patient, and lasted about an hour . . . Lucy Bennett stated she left home because her daughter had been mean to her . . . stated her daughter lived across the street . . . was unable to give the then date, her age, the year or the month . . . knew nothing of her life history except that she was born in Mississippi . . . stated that she sold her home for $300 but did not know where the money was. In the doctor's opinion, Lucy Bennett was senile . . . "from the history, she has shown evidence of mental enfeeblement for some five or ten years." However, after reading Dr. Fletcher's testimony, one definitely gains the impression that she was not emphatic in declaring Lucy Bennett incompetent (to an extent required by the law in invalidating a deed). For instance:

"Q. Now what was your opinion as to her senility?

A. I think Mrs. Bennett is just like any of us will be when we get that old. I think maybe at times she has some psychotic manifestations such as thinking people are trying to poison her and believing in voodoo and things of that type. Of course, we know she unfortunately is illiterate. I do feel her changes now are due to old age.

Q. Would you say she was senile in your opinion?

A. I do.

Q. You definitely think she is senile?

A. I do.

Q. Do you believe she is capable of taking care of her own business?

A. I do not *think so*.[5]

\* \* \*

. THE COURT: You don't think it is safe for her to own the property and try to get welfare checks, try to handle her business?

---

[5] Emphasis supplied.

A. I think somebody needs to help her.

THE COURT: Appoint a guardian for her, is that it?

A. Yes.

* * *

Q. Apparently she is up close to eighty years old. Now is she any worse off than most folks around that age?

A. No, sir, anybody that age and she has an additional problem of not having the education that most of us enjoy."

In the Chancery hearing, Dr. Fletcher testified as follows:

"THE COURT: Do you think she had the ability to make a deed, Doctor?

THE WITNESS: She did not.

MR. BROWN: Say specifically on the 24th of April, 1956.

THE WITNESS: I do not think she was competent on that date.

MR. BROWN: She would not have had the mental capacity to make a deed at that time?

A. I do not think so."

We do not feel that the above evidence is sufficient under our holdings to invalidate the deed. As stated in *McEvoy* v. *Tucker*, 115 Ark. 430, 171 S. W. 888:

"The test of mental capacity to execute a deed was stated by Justice Riddick in the case of *Seawel* v. *Dirst*, 70 Ark. 166, in which case it was said: 'It follows, therefore, that the proof which is designed to invalidate a man's deed or contract on the ground of insanity must show inability to exercise a reasonable judgment in regard to the matter involved in the conveyance. . . . To have that effect (*i.e.*, to invalidate the deed), the in-

sanity must be such as to disqualify him from intelligently comprehending and acting upon the business affairs out of which the conveyance grew, and to prevent him from understanding the nature and consequences of his act.' "

If the decree is to be affirmed, it must be on the basis of Dr. Fletcher's testimony. Dr. Fletcher only saw Lucy Bennett the one time, for one hour. The deed had been executed five months earlier, and we are inclined to believe that neighbors, who had known the alleged incompetent for a long period of time, were in a better position to know the true condition than one who had only observed her for so short a period of time; likewise, the neighbors were much more positive in their testimony than was Dr. Fletcher. We particularly note the statement: *"I think Mrs. Bennett is just like any of us will be when we get that old."* We conclude that the Chancellor's finding that Lucy Bennett was mentally incompetent to execute a deed on April 24th, was erroneous.

There is no competent evidence in the record as to the value of the property. Dr. Fletcher was the only witness who testified in this regard, and she prefaced her remarks by saying: "I'm not a very good judge of property." We deem the consideration adequate, whatever the amount stated in the deed, for it appears that the actual consideration was the agreement to take care of Lucy Bennett the rest of her life. According to Lucy's testimony, and that of the Fosters, this was the consideration, and apparently was being carried out by the grantees. Such an agreement has been upheld so many times as a valid consideration that a citing of authority is not necessary. While this record, of course, only extends through the latter part of July, 1957, there is nothing therein that would indicate the Fosters were unwilling to carry out their contract. They even acquired a wheel chair for the use of Lucy Bennett; according to her testimony, the Fosters "do all they can for me" . . . treated her well . . . gave her a dollar a week for spending money . . . , and she

was apparently completely satisfied with the arrangement.

Accordingly, the decree is reversed and remanded with directions to enter a decree in conformity with this opinion.