BURNS *v.* FIELDER.

4-5212-4-5213 (consolidated)          122 S. W. 2d 160

Opinion delivered November 21, 1938.

*S. E. Gilliam* and *Cockrill, Armistead & Rector,* for appellant.

*Robert C. Knox* and *M. P. Matheney,* for appellee and cross-appellants; *Mahony & Yocum,* and *W. A. Speer* for certain cross-appellees, and *Jeff Davis,* for other cross-appellees.

GRIFFIN SMITH, C. J. The question is, Did the grantee in a deed and the parties who executed and delivered it, such deed being absolute in form, intend that it should be a mortgage?

Although numerous litigants appear in the record, some as cross-appellants and some as cross-appellees, it is not necessary, in the view we take of the case, to refer to all of them, or to review their contentions. The principals are W. A. Burns and J. M. Fielder.

Fielder married Burns' daughter, Eva, and the couple had for a long time resided on the rural property owned by Fielder, which he either inherited or acquired by will from his mother. Burns, a fairly well-to-do farmer, lived four or five miles distant.

A reasonable conclusion to be drawn from all the evidence is that Fielder, either because of poor health or inability—or both—was not a good manager. He was unable to meet some of his obligations, and had received financial accommodations from his father-in-law. He owed $400 to National Bank of Commerce, El Dorado, and early in 1930 the bank was pressing for payment.

Burns interceded for Fielder, but without avail. Thereupon, they applied to First National Bank of El Dorado for a loan, which was granted.

February 1, 1930, Fielder and his wife borrowed $700, evidenced by notes for $300 and $400. To the $300 note was added interest of $24, while $32 in interest was added to the $400 note. The total indebtedness as reflected by these transactions was $756. The $300 note was signed by Burns as co-maker. It was also secured by a mortgage on Fielder's 60 acres of land. The mortgage secured any other indebtedness the makers might owe the bank. The $400 note, as expressed by G. M. Wade, cashier of the bank, "was secured by the indorsement and co-signature of W. A. Burns."

There were a number of renewals of the notes. March 20, 1931, the $300 obligation, with interest, amounted to $330; and it was paid by Fielder. The $400 note, as renewed with interest, matured November 15, 1932, for $440.

Wade testified that he wrote Fielder to come in and pay the remaining note; that Fielder explained he had been sick, had not done any farming, and could not pay the interest.

Failing to obtain satisfaction from Fielder, Wade wrote to Burns, and the latter paid the note April 13, 1933. To secure funds with which to make the payment, Burns pledged 35 bales of cotton to the bank, and procured $615.21.

Wade's recollection was that several days prior to April 13 Burns and Fielder came to the bank and talked with him, "and the decision arrived at was that Fielder was to make the deed to Mr. Burns. . . . I had written Mr. Fielder to come and make some arrangements, and they came in and said Mr. Fielder wanted to make a deed—Mr. Burns told me they had come to that decision. I think this was probably four or five days before the [Burns] note was executed."

Wade had offered to take the land for the debt, but preferred to make a loan on Burns' cotton and have the obligation paid. He was positive nothing was said about the deed from Fielder to Burns being a mortgage:

"I am sure it was a deed. There wasn't any mention of a mortgage."

At the trial Burns was unable to produce the $440 Fielder note, but in an affidavit attached to a petition to open the decree—a proceeding in the nature of a bill of review—Burns stated that the note had been discovered, and that the indorsement thereon was: "Paid by note of W. A. Burns, 4/13/33." In connection with this same proceeding G. M. Wade executed an affidavit saying he had seen the cancelled note, and that the "paid" indorsement was in the handwriting of an employee of the bank.

Mrs. Fielder was in the bank at the time her husband's note was paid, but apparently took no part in the conversations. The deed from Fielder to Burns was prepared in the bank, and was signed by Mrs. Fielder.

In its decree the court cancelled the deed to Burns, but held that subsequent purchasers were protected. Judgment went against Burns for money he had received from the sale of leases and minerals, less the amount found to be due Burns by Fielder. The chancellor apparently treated Burns' payment of Fielder's note as a loan to the latter. Burns did not surrender the mortgage. The deed was not filed of record until May, 1936.

Fielder contends that when the bank insisted upon payment of the $440 note, Burns came to him and suggested that he deed the property to the bank; that he demurred, explaining that if he forced foreclosure he would have a better opportunity to redeem; that Burns finally said that if he (Fielder) would make the deed to him (Burns), the opportunity to redeem would be better. "He also said he wanted the money, and any way we could raise the money I could redeem the land, and we agreed to make the deed under that condition, under those terms."

On cross-examination Fielder stated that "Burns refused to give me the land back in 1933"; that in 1933 when a man named Lagrone wanted to rent a part of the place he (Fielder) didn't know whether he could rent it or not "because they might foreclose"; that he sent Lagrone to Burns and the land was rented; that it was

his intention that proceeds of the rent should be applied by Burns on an existing indebtedness, although Burns denied this; that he had never asked Burns for the rent money; that he did not demand of Burns the money received from Bailey and Trimble for oil leases; that he did not undertake to sell leases and pay off the so-called mortgage "because it wasn't worth anything then"; that he intended to use his bonus money to pay the debt; that he offered to pledge his bonus bonds or certificate to Burns, but the latter would not accept them. This occurred after the land became valuable.

The witness admitted that, under his agreement with Burns, there was no obligation to redeem. The question. was asked: "If you didn't want to you didn't have to?" And the answer was, "Yes, that is it." Asked if he regarded his obligation to Burns of a nature sufficient to permit suit against him, Fielder replied, "No."

Burns' testimony in many respects was in direct conflict with that of Fielder. Other points of interest in the evidence are:

Both Burns and Wade testified that Burns told Fielder he and his wife could continue to live on the place and have whatever they made on it. Value of the land as of April, 1933, was variously estimated at from $5 to $15 per acre. Wade testified that he had sold some land for $3.10 per acre. R. L. Lane testified that his attention was directed to a sign on the Fielder land which in substance was a notice to trespassers to keep out. The sign had been prepared for Burns at Fielders' suggestion. In consequence of this sign, Lane went to Burns and paid $400 for a lease. It was then ascertained that the Fielder-Burns deed had not been recorded. Lane testified that when he mentioned this to Burns the latter appeared surprised. Together they went to the bank, and the bank sent an agent with them to the court house. The agent indorsed satisfaction of the Fielder mortgage. Burns says that Lane requested that he, too, indorse the record, showing satisfaction, and that he did so. The deed was then recorded. The record did not disclose an assignment of the mortgage to Burns.

The lease sold by Burns to Lane covered 40 acres of the Fielder lands. After Burns recorded the deed, Lane assigned his lease to O. C. Bailey and J. D. Trimble. Thereafter, Burns executed a deed conveying one-half of the mineral rights of the 40 acres covered by the lease, but subject to the lease, and assigning one-half of the royalties payable under the lease. He also executed a lease on two acres of the remaining 20. Fielder, prior to 1933, had conveyed all of the minerals on 18 acres.

March 31, 1937, after an oil field had been proved, Fielder executed an oil and gas lease on 42 acres of the land in favor of Shaw, Hodges, Williams and Westbrook, of Jefferson, Texas. On the same day he executed a power of attorney, coupled with an interest, to Shaw. Acting under this power Shaw undertook to have the Fielder deed to the fee cancelled. June 3, 1937, Fielder and his wife executed a mineral deed to Westbrook, Hodges, and Williams, conveying one-half of the minerals on the 42-acre tract.

Aside from the personal testimony, a circumstance in favor of appellees' contention is that Burns did not have his deed recorded. Fielder testified that it was agreed this should not be done. It is urged by appellees that Burns, in retaining Fielders' note and the mortgage, and later in satisfying the mortgage of record, gave credence to what appellees contend is true, that is, Burns held the mortgage as additional security; or, rather, he looked upon it as an assignment.

By his own admission, however, Fielder construes the transaction as one whereby he, within his own discretion, and at a time convenient to his purpose, could tender repayment to Burns and repossess the property; but Burns, on the other hand, could not sue him. The most that can be said of the agreement, construed most favorably in Fielder's behalf, is that it was a sale coupled with an option to repurchase.

The evidence necessary to impeach the solemn recitations of the deed must be clear and convincing. As was said in Bevens v. Brown, 196 Ark. 1177, 120 S. W. 2d 574, such evidence "must be so clear that reasonable minds will have no doubt that such an agreement was

executed. It must be so convincing that serious argument cannot be urged against it by reasonable people."

Tested in the light of this rule, we do not believe the purported agreement should have been accorded that high degree of verity which must attach to alleged verbal reservations. or conditions in order to overthrow solemn recitals of a deed. Business transactions must have finality. Conveyances must not be exposed to the caprice of parol, nor explained away by less than that quantum of evidence which essentially attains the dignity of clarity, impressing conviction.

In the instant case such evidence is lacking. Therefore, the decree is reversed in part, with directions that title to the land be quieted in Burns under the deed from Fielder, and that those taking interests conveyed by Burns be protected. It is further ordered that all instruments purporting to convey an interest in either the mineral or surface rights, or to the fee, executed by Fielder subsequent to April 13, 1933, as reflected by this record, be cancelled as clouds upon the title of Burns.