DANIELS *v.* MOORE.

4-5258                                    125 S. W. 2d. 456

Opinion delivered February 6, 1939.

*Coulter & Coulter, S. E. Gilliam, James H. Nobles, Jr.,* and *J. R. Wilson,* for appellant.

*Robert C. Knox,* for appellee.

HUMPHREYS, J. This is an appeal from a decree of the chancery court of Union county, second division, rendered on the 12th day of January, 1938, dismissing the complaint of appellants for the want of equity and quieting and confirming the title to the northeast quarter of the southwest quarter, section 26, township 18 south, range 17 west, including all of the oil, gas and other minerals thereunder, in fee simple absolute in appellees, Lizzie Moore, A. B. Moore, J. W. Moore, W. F. Moore, Elizabeth Sloan and Neil Sloan, as the widow and heirs of J. B. Moore, deceased, against the claims of appellants, Mattie Daniels and John Daniels or either of them.

The issues joined in the pleadings were, first, whether a warranty deed executed to said 40-acre tract of land from Mattie Daniels to J. B. Moore, deceased, of date November 23, 1923, was intended as a mortgage although in form a deed; second, and if a deed whether appellants had acquired the title back to said 40-acre tract by adverse possession; and, third, whether appellants were estopped by laches from claiming the instrument to be a mortgage although in form a deed.

The record reflects that on September 12, 1918, John Daniels purchased from Jackson McCorvey said 40 acres of land, together with 120 acres adjoining same. A vendor's lien was retained in the deed for $1,500 to secure the purchase price.

John Daniels acquired 80 acres of land in section 24, giving him in all 240 acres of land in sections 24 and 26.

On October 1, 1920, appellants mortgaged all the land they owned, or 240 acres in the two sections, to the Federal Land Bank in St. Louis. McCorvey satisfied his lien on the 160-acre tract so that the Federal Land Bank would have the first mortgage thereon. McCorvey then took a second mortgage on the entire 240 acres in sections 24 and 26 to secure the balance due him for purchase money on the 160-acre tract and took notes from appellants for the purchase money. These notes were subsequently bought by the First National Bank of Junction City, Arkansas.

John Daniels then borrowed some money from the First National Bank of Huttig, Arkansas, and to secure same executed a mortgage on his crops and live stock. The chattel mortgage was lost when John Daniels turned warehouse receipts for his cotton in the fall of 1920 over to the Huttig bank, but in January following he procured these receipts from said bank for the purpose of selling the cotton and accounting to the bank for the proceeds. He sold the cotton, but failed to pay the bank the proceeds thereof and left the country. The chattels pledged in the mortgage had also been disposed of by him when leaving. The Huttig bank, in order to protect itself, prevailed upon the Junction City bank to foreclose under its power in the mortgage on the 240 acres of land and at the sale of the property purchased same for sufficient to pay the Junction City bank and also the indebtedness due the Huttig bank, and the trustee in the mortgage made the Huttig bank a deed to the property for the 240-acre tract of land. This deed, through mistake, recited that the mortgage was owned by the Huttig bank, instead of the Junction City bank.

John Daniels was indicted for disposing of the mortgaged property and was arrested in California and

brought back to Arkansas and placed in the Union county jail.

While he was in jail on May 11, 1921, he executed a mineral deed to J. B. Moore on the 240 acres of land and on the following day conveyed all of the land to Mattie Daniels, his wife, reciting in the deed that it was subject to a deed previously executed to J. B. Moore.

It appears that in June, 1922, Mattie Daniels executed to J. B. Moore a deed to the 40 acres in controversy here. This deed was lost and on November 29, 1923, Mattie Daniels executed another deed for said 40-acre tract to J. B. Moore which contained a recitation that it was given in lieu of a former deed executed by the vendor about June, 1922.

There is testimony in the record, introduced by appellants, tending to show that the mineral deed executed on May 11, 1921, by John and Mattie Daniels to J. B. Moore was executed and delivered to J. B. Moore to secure an attorney's fee of $100 for representing him in the criminal charge against him and for bringing a suit to set aside the sale of the lands under the foreclosure proceeding of the Junction City bank at which foreclosure sale the Huttig bank bought the lands, and that the two deeds executed by Mattie Daniels to the 40-acre tract in question herein were executed by her in substitution for the mineral deed to secure said $100 fee.

John Daniels plead guilty to the criminal charge and through the efforts of J. B. Moore was pardoned and J. B. Moore brought a suit for the appellants herein to set aside the mortgage foreclosure aforesaid. The suit to set aside the mortgage foreclosure was later compromised. During the pendency of the suit appellants herein and J. B. Moore entered into a contract with the Atlantic Producing Company and J. W. Olvey for the sale of an oil and gas lease upon the entire 240 acres of land. Prior to the foreclosure sale appellants had sold one-half of the minerals on 40 acres of said land described as northeast quarter of the southwest quarter, section 26, township 18 south, range 17 west to W. B. Johnson, and W. B. Johnson joined with the appellants and J. B. Moore in making the contract and leases with the Atlantic Produc-

ing Company and Olvey. These leases were attached to an escrow agreement, which agreement reflected that the total consideration for the leases was $3,000. Under the terms of the escrow agreement J. B. Moore was to be paid $500 for his mineral interest in the 40-acre tract in question and $1,250 for his mineral interest in the other 200 acres and he allowed appellants to use the $1,250 in making the settlement with the Huttig bank.

A compromise was effected in the suit J. B. Moore had brought to set aside the foreclosure sale and the two banks received $3,000, $2,100 being paid in cash and appellants gave the Huttig bank a mortgage to secure the balance of $900.

The 40 acres involved in this suit was conveyed by a quitclaim deed by the Huttig bank to J. B. Moore and this 40-acre tract was not included in the mortgage appellants executed to the Huttig bank to secure the $900 balance they owed it.

The money received with which the claim of the banks was settled was a part of that received by appellants from the lease to the Atlantic Producing Company.

The 40-acre tract in controversy was the middle 40 John Daniels bought from Jackson McCorvey. When John Daniels bought this land he moved in a house on one of the other 40's and has since lived upon the 160-acre tract. The 40 acres in controversy was included within the fences upon this homestead and some five or six acres of said 40 were cultivated by John Daniels. John Daniels made no improvements upon it further than keeping up the fences. After making the warranty deed to J. B. Moore on November 29, 1923, by Mattie Daniels, J. B. Moore in his lifetime paid the taxes thereon until his death on September 11, 1926, and thereafter the taxes were paid by the Moore heirs until the institution of this suit. After the deed was executed to J. B. Moore to said 40-acre tract the Daniels continued to pay the taxes on the other 200 acres they owned.

When J. B. Moore died one of his sons, W. F. Moore, administered upon his estate and his three sons went to El Dorado for the purpose of looking into his affairs. They had conversations with John Daniels at that time

and several conversations afterwards relative to the 40-acre tract in controversy and were told by him that they conveyed a one-half interest by mineral deed to J. B. Moore, their father, to 240 acres, and later the warranty deed for the 40 acres in controversy to him also in payment for representing him in lawsuits. They also testified that it was agreed between them and him that he would take care of the 40-acre tract in controversy and keep the fences up around it and prevent people from cutting the timber on it for the use of six or seven acres which were in cultivation on it.

John Daniels denied that he made such statements to them or any such arrangement with them, but that he informed them at that time that both instruments were given to secure the $100 fee he owed J. B. Moore and that the fee was afterwards paid.

Witnesses who resided in the community where the 40-acre tract was located testified pro and con relative to whose property it was. Some of them testified that it was generally understood to be the property of appellants and others that it was understood to be the property of J. B. Moore or the Moore heirs. Other witnesses testified that Daniels cut and sold timber off of the 40-acre tract for his own use and benefit and others that he informed them that the land belonged to J. B. Moore and that he had no right to sell timber off of it.

There are other circumstances revealed in the record tending to show that the mineral and warranty deeds were intended as mortgages and other circumstances tending to show that they were both intended to be absolute deeds. It would extend this opinion to great length to set out all the evidence introduced in the case. After a very careful reading of the record we are unable to say that the chancellor's finding and decree is contrary to a preponderance of the evidence. This suit was not brought during the lifetime of J. B. Moore and not until about eleven years after he died. It could have been brought within his lifetime as well as a long time after he died. If it had been brought in his lifetime his lips would not have been sealed by death so that he could not

testify relative to the original transactions. By waiting for more than fifteen years to bring this suit the Moore heirs have been deprived of his testimony.

We do not think this evidence is of that clearness required under the law to say that a deed absolute upon its face was intended to be a mortgage. The rule relative to the character of the evidence required to prove that a deed in form was intended as a mortgage was recently re-announced and re-affirmed in the case of *Burns* v. *Fielder, ante,* p. 85; 122 S. W. 2d 160, in the following language:

"The evidence necessary to impeach the solemn recitation of the deed must be clear and convincing. . . . such evidence must be so clear that reasonable minds will have no doubt that such an agrement was executed. It must be so convincing that serious argument cannot be urged against it by reasonable people.

". . . Business transactions must have finality. Conveyances must not be exposed to the caprice of parol, nor explained away by less than that quantum of evidence which essentially attains the dignity of clarity, impressing conviction."

We do not think the record in this case meets that requirement.

There is also a general rule to the effect that the retention of the possession of vendors after the execution and delivery of a deed is presumed to be in subordination of the title conveyed and the statute of limitations will not begin to run until notice of the hostility of their claim is actually given to the grantee. This rule was well stated in the case of *City of Stuttgart* v. *John,* 85 Ark. 520, 109 S. W. 541. We do not think this presumption was overcome by a preponderance of the evidence. During the period the 40-acre tract was occupied by appellants the trial court had a right under the record in this case to find that appellants' possession of the 40-acre tract after the execution of the deed was attributable to their tenancy and not to their ownership or claim of ownership. We are also of opinion that even if the findings and decree of the trial court were not sustained

734

by a preponderance of the evidence under the rule announced above that appellant should be denied a recovery on account of their inexcusable delay in bringing their suit. The first deed to the 40-acre tract was executed in 1922 and the second in 1923 and according to appellants' contention the debt was paid in 1926. This suit was not filed until September 25, 1937, more than fifteen years after the execution of the deed and more than eleven years after the time when appellants claimed that J. B. Moore was paid for his services. J. B. Moore died in 1926 and appellees herein have been deprived of his testimony as to the true nature of the original transactions and because of appellants' delay it has, of course, become difficult for the Moores to prove just what the original transactions were. On account of this unnecessary delay and the loss of the testimony of J. B. Moore who might speak relative to the original transactions the doctrine of laches should be applied, and for that reason as well as the findings and decree of the chancellor should be affirmed, which is accordingly done.

Holt, J., dissents.