STEPHENS v. KEENER.

4-5782 137 S. W. 253

Opinion delivered February 19, 1940.

*McKay, McKay & Anderson* and *Whitley & Utley,* for appellant.

*Madrid B. Loftin* and *Walter L. Pope,* for appellee.

Holt, J. Appellant brings this appeal from a decree of the Columbia chancery court, second division, setting aside and canceling a certain mineral deed executed by James Keener, Sr., to appellant for a one-half interest in the minerals in a certain eighty-acre tract of land.

Appellee (plaintiff below) alleged that the mineral deed in question, which he executed in favor of appellant, was without consideration and that he did not know that he was executing a mineral deed to said land at the time he signed the deed; that he did not intend to execute a mineral deed, but intended to execute an oil and gas lease only; and prayed that the deed be canceled as a cloud upon his title.

Appellant (defendant below) answered admitting appellee's ownership of the land in question except a one-half interest in the minerals therein. She admitted that she obtained the mineral deed to one-half of the minerals in the land in question, but denied that there was no consideration paid by her for said mineral deed and that same was null and void.

The testimony as reflected by the record is to the following effect:

Appellee, James Keener, Sr., is a negro eighty years of age and had lived on the land in controversy since 1900. J. M. Talley, a brother of appellant, Mary P. Stephens, came to appellee's home early in 1936 and discussed with him the leasing of the land in question for oil and gas purposes. Appellee was well acquainted with Talley and quoting from appellee's testimony:

"When he came there, he wanted to lease the land, and I told him it had gone delinquent, and that I had sent to Little Rock to know about it, and had sent them a letter to get the amount and they said $34.75, and he said he would go up and pay that off, and he came back to town, and then he came back out there and said he had sent the money off, and that I could lease it, and he was to give me $1 per acre, and he was to take the money and

pay the taxes with part of it, and then he paid me one payment in March of $6, the first time, and another payment of $4 the next time. . . . Q. Did he bring the papers for you to sign? A. He came back once after that, it was at twelve o'clock, and he pulled out a deed and said, 'Here is the deed, Uncle Jim, and you sign it and I won't come back out here any more bothering you.' . . . A. He paid the taxes and then he came back and I signed the deed. Q. What did you sign? A. I signed a lease at $1 per acre. Q. Was anything said about you giving him a mineral deed? A. No, sir, nothing. Q. Did you sign two papers? A. Yes, sir, I signed two papers. I thought I was signing one for him and one for me. . . . Q. Did Mr. Talley read the paper to you? A. No, sir. Q. You could have read it? A. Yes, sir. . . . Q. They were going to get a block out there? A. Yes, sir. . . . Q. And you thought your lease would go into the block? A. That is what they said.''

Appellee further testified he talked with Mr. Stephens about the matter and said Mr. Stephens agreed to deed everything back if appellee would give Mr. Stephens one-fourth of the royalty. Mr. Edgar Hawkins advised him not to do that. Mr. Stephens told witness the expense was $125.

Appellee's wife testified that she was present when Mr. Talley brought the papers for her husband and her to sign; Mr. Talley wanted a lease on the land; that they sold the lease to Mr. Talley for $1 per acre, which was around $80 for the entire tract. Said there was nothing said about a mineral deed. Did not know they were signing a mineral deed, and thought she was signing a lease. Said she thought that there was about $30 taxes due on the land. And further, quoting from her testimony:

''Q. When he came out there you told him the land was forfeited for the taxes? A. Yes, sir. Q. And you wanted to get him to help you get it back? A. Yes, sir, he was to pay the taxes to get it back. Q. Did he do that? A. Yes, sir. . . . Q. How many papers did you sign? A. I didn't sign but two. He was to leave one there with us and he was to take one, but he took them both. . . .

Q. At that time there wasn't any leasing going on out there? A. No, sir."

James Keener, Jr., testified that he was present at his father's house when the deed and the lease were signed, knew that Mr. Talley was getting up a block of leases, and that his father was getting $1 per acre. He further testified that there was nothing said about a mineral deed.

George Keener, another son of appellee, testified that he was also present when the deed and lease were signed by his father and mother, heard the discussion between Talley and his father and that his father was getting $1 per acre for the lease and further testified: "Q. Was anything said about how he was to pay the $1 per acre? A. Yes, sir. The land was up for its taxes and he was to pay the taxes out of the $80 he was paying for the lease, and the balance of it was to come to my father." He saw his father sign the papers, but he, witness, did not read them.

Curtis McRae, appellee's grandson, was also present at the time and corroborated the testimony of James Keener, Jr., and George Keener. He further testified that he could read, and quoting: "Q. How many papers were there? A. Two. Q. And you didn't read them? A. No, sir. Q. You could have read them? A. Yes, sir. . . . Q. What did he say when he came back the second time? A. He signed two papers. Q. What papers? A. The lease and a copy of the lease."

Mr. J. T. Stephens, appellant's husband, testified relative to appellant's acquiring the lease and the mineral deed, and quoting from his testimony: "I have been engaged in the abstract and title business for the last fifteen or twenty years, and have been more or less·interested in oil leases since I have been doing work for the big oil companies, and in 1936 I decided I would get up a block of leases in that immediate territory and see if I could get a well. . . . I approached Mr. Talley, as my notary public, and we contracted for around 3,500 acres. . . . Among the landowners out there was Jim Keener. We could have bought any amount of acreage out there for fifty cents per acre, either for the lease or one-half of the minerals. . . ."

He further testified: "Well, Jim came in and told us that he would give us a deed to his place if we would pay his taxes and let him stay there as long as he lived, but I didn't want the place, so I told him I would pay the taxes for a lease and one-half of the minerals. That was music to his ears. I wrote to Little Rock for a statement of his taxes, and when it came back it was considerably more than $1 per acre on his land, but we had agreed to do that, to take the lease and one-half of the minerals, so I wouldn't go back on my word. I sent it out there for Jim to sign, and got the lease. The lease was put up just as other leases out there were. Jim very readily signed these papers, for he had represented to me that he was destitute, didn't have anything to live on, and I advanced him $10 on the lease and told him, I said, 'If we handle your lease you will have $70 more coming,' and I explained the minerals to him. For two years after that Jim was very profuse for what we had done for him. Leases commenced to pick up out there, and Jim came to see a lawyer . . ."

He further testified: "Jim wanted me to turn all the papers over to him, and I said to him, 'You owe me $102 and interest for two years, but if you will give me one-fourth interest in your minerals I will deed it back to you.' He said he couldn't. He said he was going to mortgage the land, and I said, 'If you are going to mortgage it for what you owe me you can't do it, for I have the lease and a mineral deed; and it was perfectly fair.' "

He further testified that he redeemed the land in question at a cost of $102.33. The block did not go through.

On this state of the record appellant contends here that there was consideration for the execution by appellee and his wife of the mineral deed in question; that they executed it in good faith, knew what they were signing; that no fraud or deception was practiced upon either of them by appellant in procuring the mineral deed, and, therefore, the learned chancellor erred in setting aside and canceling the deed.

After a careful review of all of the testimony we have reached the conclusion that appellant is correct in her contention.

Before we would be warranted in setting aside the solemn recitals in a deed, a written instrument signed and acknowledged, the quantum of testimony required must rise above a preponderance of the testimony. To do this the evidence must be clear, cogent and convincing. A mere preponderance is not sufficient.

In 20 American Jurisprudence 1103, the textwriter in stating the general rule, says:

"Section 1252. The general rule in civil cases that the party having the burden of proof must establish his case by a preponderance of the evidence is not of universal application. In certain classes of cases proof by a preponderance of the evidence is held to be insufficient. . . .

"Section 1253. Proof of those issues as to which a stricter degree of proof than by a preponderance of the evidence is required by the courts, is generally satisfied by 'clear and convincing' evidence, or evidence that is 'clear and satisfactory,' or evidence described by similar terms. For example, such strict degree of proof has been required in order to establish the existence of fraud, or to establish a parol trust in real or personal property, or where reformation, cancellation, or rescission of a written instrument on the ground of fraud or mistake . . ."

And in a footnote the author quotes with approval from an opinion of the North Dakota Supreme Court in *Jasper* v. *Hazen,* 4 N. D. 1, 58 N. W. 454, 23 L. R. A. 58, 63, as follows:- "The presumption that an instrument executed with the formality of a deed, or a contract deliberately entered into, expresses on its face its true intent and purpose, is so persuasive that he who would establish the contrary must go far beyond the ordinary rule of preponderance. To demand less would be to lose sight of this presumption, which is one of the strongest disputable presumptions known to the law. Hence, courts have, with great uniformity, in this class of cases, re-

quired the proof that should destroy the recitals in a solemn instrument to be clear, specific, satisfactory, and of such a character as to leave in the mind of the chancellor no hesitation or substantial doubt.''

In *Morris* v. *Cobb,* 147 Ark. 184, 190, 227 S. W. 23, this court said: ''Again, appellant is in the attitude of impeaching the deed purported to have been executed and acknowledged by him. He could only do this by clear, cogent and convincing evidence. *Bell* v. *Castleberry,* 96 Ark. 564, 132 S. W. 649; *Polk* v. *Brown,* 117 Ark. 326, 175 S. W. 562. His evidence does not meet this requirement.''

And in the recent case of *Burns* v. *Fielder,* 197 Ark. 85, 122 S. W. 2d 160, this court said:

''The evidence necessary to impeach the solemn recitations of the deed must be clear and convincing. As was said in *Bevens* v. *Brown,* 196 Ark. 1177, 120 S. W. 2d 574, such evidence 'must be so clear that reasonable minds will have no doubt that such an agreement was executed. It must be so convincing that serious argument cannot be urged against it by reasonable people.'

''Tested in the light of this rule, we do not believe the purported agreement should have been accorded that high degree of verity which must attach to alleged verbal reservations or conditions in order to overthrow solemn recitals of a deed. Business transactions must have finality. Conveyances must not be exposed to the caprice of parol, nor explained away by less than that quantum of evidence which essentially attains the dignity of clarity, impressing conviction.''

Applying this rule, we do not think the evidence in the instant case measures up to that high degree that would justify the cancellation and setting aside of the mineral deed in question.

Appellee and his wife admitted signing and acknowledging the deed. They could both read, but did not read the deed. Appellee admitted that Mr. Talley brought the papers for him to sign, and quoting from his testimony: ''He came back once after that, it was at twelve o'clock, and he pulled out a deed and said, 'Here is the deed,

Uncle Jim, and you sign it and I won't come back out here any more bothering you'.'' Appellee admitted signing two papers, but claimed that he thought one was the original oil and gas lease and the other a copy. He does not explain why he did not keep what he thought was his copy. He and his wife admitted signing and acknowledging two instruments. No claim of forgery is alleged. No excuse is offered by appellee for not examining and reading the mineral deed and the oil and gas lease except that he trusted Mr. Talley.

On the question of consideration, we think little need be said. It is undisputed that appellant redeemed the land in question from a tax forfeiture at a cost of $102.33. He had agreed to pay appellee $1 per acre or $80 for the oil and gas lease. In addition to the $102.33, appellant advanced to appellee $10 with which to buy food, making a total of $112.33 that appellant had expended on the two transactions. We think this was ample to support a consideration for the mineral deed over and above the $80 consideration for the oil and gas lease.

On the whole case we conclude, that the learned chancellor erred in setting aside and canceling the mineral deed in question, and accordingly the decree is reversed with directions to dismiss the plaintiff's complaint for want of equity.