*Ezra Garner* and *McKay, McKay & Anderson,* for appellants.

*A. B. Vaughn, A. A. Thomason, Wilson & Wilson* and *Pace & Davis,* for appellees.

GRIFFIN SMITH, C. J. The question is whether certain deeds were intended to be mortgages. The chancellor found that the parties so regarded them and that there was no estoppel.

J. A. Foster and N. W. Gunnels are farmers residing in the same community in Columbia county. Foster is 80 years of age. Gunnels is 57. In 1921 Gunnels bor-

rowed $2,860 of Foster. As security a deed of trust was executed by Gunnels and his wife.

January 30, 1924, Gunnels' indebtedness to Foster amounted to $3,153.91. At that time a warranty deed in Foster's favor was executed. Gunnels then remained in possession, having delivered to Foster his eight promissory notes. If the deed was treated as a mortgage, there was an agreement that upon payment of the notes the obligation would be discharged. If the conveyance was absolute, there must have been an agreement for repurchase. However, nothing was paid by Gunnels, and in February, 1926, Foster filed suit. He alleged that when the notes were accepted he executed bond for title, agreeing that if the notes should be paid according to their tenor the land would be reconveyed to Gunnels. It was averred that Gunnels defaulted in $394.24 due November 15, 1924, and for a like amount in 1925. The prayer was for judgment on eight notes, ". . . and that the said sums be declared liens upon said lands, and that said lands be sold to pay the indebtedness."[1]

The land pledged as security for the 1921 loan was described as the northeast quarter of section 24, township 17 south, range 20 west, and 19.72 acres on the west side of the southwest quarter of the northwest quarter of section 19, township 17, south, range 19 west.[2]

Gunnels testified that when suit was filed he went to Foster and asked "Why have you entered suit on me at this time of the year?" He contends service of summons was the first notice he had of Foster's intentions in respect of the property. Foster's reply was that he wanted his money, and Gunnels said he didn't have it. He testified to having suggested selling the west eighty; that he thought he had a buyer who would pay $2,500, but that Foster would not agree to this. Finally, according to Gunnels' explanation of the conversation, Foster

---

[1] Summonses were served on the defendants February 25, 1926.

[2] If the southwest quarter of the northwest quarter had contained 40 acres, the deed of trust would have conveyed 180 acres. The land in range 19 is immediately east of the described southeast forty in township 17. In reality the southwest quarter of the northwest quarter in section 19 is fractional, containing 34.72 acres, half of which is 17.36.

said: "If you will make me a quitclaim deed, or just renew the mortgage, and you move off and let me have the use of the property, I think I can work it out of the land you have, and the pasture. I will give you fifteen years to pay it out."

Gunnels insists that with this understanding he executed the quitclaim deed and moved to other property. Mrs. Gunnels testified that when she joined in the deed she knew it was not a mortgage, but she did not intend to part with her interest.

R. A. Robinson,[3] Gunnels' brother-in-law, was willing to testify that Gunnels, when sued, asked his advice. Interest on the loan was $210 a year. It was Robinson's opinion that Gunnels' best course in 1926 was to deed the property to Foster if it would be accepted for the debt. Robinson so advised Gunnels. At that time the debt, with interest, was in excess of $3,800.

Gunnels did not dispute the statement of a witness who testified that after the quitclaim deed had been delivered he (Gunnels) tried to sell Foster the abstract covering the property.

Capt. Wade Kitchens testified that Foster employed him to bring suit against Gunnels in 1926; that the action was on notes, and to foreclose a lien; that the quitclaim deed was given in settlement of the suit, and that he indorsed on the pleading "Dismissed." There was this further statement: "I know that the quitclaim deed to that land was given in settlement of the suit. When [the deed] was given that settled the suit I filed."

Clay Barnett, real estate broker, testified that in December, 1937, he discussed leases with Foster, and that Foster told him he had not settled with Gunnels and could not make a lease.

In the spring of 1938 Foster attempted to sell a lease on the property in section 19. The purchaser would

---

[3] In an amendment to appellants' motion to vacate the decree and reopen the cause for further proof, an affidavit was filed in which the proposed testimony of Robinson was set out. Since the opinion here would be the same without this evidence, we do not determine whether the court erred in refusing to reopen the suit.

not close on Foster's title, but required that Foster secure an additional quitclaim deed from Gunnels.[4] A consideration of $500 was agreed upon, Foster permitting this amount to be deducted from the price.

Counsel for appellee copy excerpts from Foster's testimony, wherein he seems to concede that the quitclaim deed was intended to be a mortgage. The question was asked: "You have [Gunnels'] 180 acres of land?" Foster replied: "I don't know whether I have or not. I paid the taxes, but I don't reckon it is mine."

Foster testified he did not ask Gunnels to sell him the land; that nothing was said about a sale—"I never thought of nothing like that." "Q. You never said anything about him making you that deed and that would settle the debt? A. No. Q. And after he made you the deed, if he had come and offered you the money, would you have taken it? A. I would along in those days, yes."

On direct examination, however, Foster testified he turned the notes and other papers over to Kitchens with directions to bring suit; that he did not talk with Gunnels; that Kitchens delivered the quitclaim deed to him, and "I thought the land was mine after they made that deed. I took charge of it in 1926, thinking it was mine, and have rented some of it to different people since that time, and have paid taxes." He further testified that from 1926 until the instant suit was filed, Gunnels had not discussed the transaction with him, nor had Gunnels' attorney. He denied making the statement testified to by Clay Barnett.

Suit was filed against Foster by Gunnels in 1939 when the first of four producing oil wells were brought in on the property. For more than thirteen years no effort was made by Gunnels to discharge his obligation to Foster. Evidence regarding value of the property in

---

[4] Reference to this transaction appears in appellees' brief at page 10. There is no citation to the transcript for identification. However, at page 252 there is copied a quitclaim deed from Gunnels and wife to Foster conveying "All of the fractional southwest one-quarter of northwest one-quarter, section 19, township 17 south, range 19 west, less the east 15 acres thereof." Under the previous conveyance (see footnote No. 2) the land conveyed in section 19 embraced 19.72 acres, whereas the true acreage was 17.36. The difference would be 2.36 acres.

1926 is unsatisfactory, ranging from $1,500 to $6,000. In respect of rental value, none of the witnesses thought it was worth more than $300 a year. Some witnesses thought $100 a year sufficient. The chancellor estimated the value at $225. The notes drew interest at ten per cent., yielding $315.39 for the first year, or $15.39 more than the most liberal estimate of income. Foster was required to pay the taxes, and to maintain the property —an obvious impossibility if income alone had been relied upon.

Gunnels says the notes given under the agreement of 1924 were not returned to him. This fact is urged as a circumstance in support of the contention that when the quitclaim deed was executed in 1926 Foster retained the notes as evidence of the obligation. This was denied by Foster.

Against Gunnels' testimony that he surrendered the property to Foster upon the latter's agreement to allow redemption within fifteen years; that Foster would manage the land in a way to prevent the debt from increasing, and would pay taxes, etc., we have the testimony of Capt. Kitchens that the quitclaim deed was accepted in settlement of the suit, the undisputed testimony of another witness that Gunnels tried to sell the property abstract to Foster; that Gunnels lived within two or three miles of the place for thirteen years and did not, until oil activities created independent values, ask for an accounting, nor did he offer to pay anything on the principal. Gunnels testified he asked Foster for a writing, evidencing the contemporaneous parol agreement he says was made, but Foster refused the request.

The quitclaim deed and surrender of the property strongly support Foster's contention that title absolute passed. To overcome the deed and Gunnels' conduct, evidence clear and convincing was essential. *Burns* v. *Fielder*, 197 Ark. 85, 122 S. W. 2d 160; *Daniels* v. *Moore*, 197 Ark. 727, 125 S. W. 2d 456; *Stephens* v. *Keener*, 199 Ark. 1051, 137 S. W. 2d 253.

These decisions, we think, control in the case at bar. If appellees are correct in their assertions that there was

no intention to part with title to the property, and if N. W. Gunnels is not mistaken in his understanding of what the parol agreement was, they must suffer loss by reason of inexcusable carelessness in not exacting written evidence of the contract. It it better that misfortune to an individual attend a given transaction than that conveyances regular in form and explicit in substance should be set aside when conduct of the parties sustains them and the evidence composing the attack is not clear and satisfactory.

The decree is reversed and the cause remanded with directions to dismiss the suit and to quiet title in appellants.