Swor *v.* Looney.

4-7109                                    172 S. W. 2d 674

Opinion delivered June 28, 1943.

*A. J. Russell,* for appellant.

*Festus O. Butt,* for appellee.

McFADDIN, J. Appellant, W. R. Swor (a man thirty-five years of age) is the son and only child of the appellee, Mrs. Effie Looney; so this is a controversy between a mother and her only child. On October 26, 1933, W. R. Swor and wife, Iza, for value received, executed to Mrs. Effie Looney their promissory note for $1,350, due five years after date and bearing interest at the rate of five per cent. per annum from date until paid with interest payable semi-annually. The note was secured by a mortgage on certain lands on which W. R. Swor and wife lived. In October, 1936, Mrs. Looney indorsed a full satisfaction on the margin of the record where the mortgage was recorded. In October, 1942, Mrs. Looney filed this suit to set aside the said satisfaction and to recover judgment on the note and to foreclose the mortgage.

The above recited facts are agreed: all other facts are controverted. Mrs. Looney claims that from the time the note was executed until October, 1936, her son paid only the interest on the note, which interest was paid by supplying her with farm products and eggs, milk, etc., and a few dollars in cash; that she was living in Green Forest, Arkansas, and became crippled sometime before the last-mentioned date; and that while she was ill, her son came to her and told her that the tax assessor was going to charge her a large amount for taxes on the mortgage, and that if she would release the mortgage of

record she would save the taxes; and that he (her son, Willie Swor) would give her a deed and a "bankable note" in lieu of the satisfied mortgage. She testified how her son pictured to her the urgency of the situation and the necessity for immediate release because the assessor was to act the next day, and she told how her son took her to the court house in a car and how she hobbled in on crutches to release the mortgage. Mrs. Looney continued to hold the original note and mortgage, and she continued to urge her son to give her the "bankable note and deed." She says that he offered various excuses and continued to pay the interest, but did not deliver the new note or deed; that she became poverty stricken and was moved out of a house because she could not pay the rent; that she was dependent upon the charity of friends and neighbors; that she appealed to her son for payment of the long past due note, or at least a partial payment; that he had plenty of money for his wife, but none for his mother; that he turned a cold ear and a stone heart to her appeals; that neighbors told her that her son was trying to beat her out of her money. Mrs. Looney consulted a lawyer and filed this suit; and then Mrs. Looney's fears were realized.

The son claimed the release of the mortgage was valid and binding; and that the debt was paid. He admitted executing the note and mortgage in 1933; but claimed that he paid the interest regularly, and that he paid the principal in three payments, to-wit: October 26, 1934, $275; October 26, 1935, $565; October 26, 1936, $510. The son claims that he made each payment in cash and that there were no witnesses; that his first receipt was lost; he exhibited what purported to be the second receipt, but the signature was denied by the mother; and he claimed the marginal indorsement was the third receipt. He claimed that his mother deceived him by stating that she had lost the original note and mortgage so that he did not get them back; but he claims he has paid her nothing since October, 1936, as he owed her nothing.

We have the legal question as to who has the burden of proof. Mrs. Looney contends that since she still has the note and mortgage, the burden of proving payment

is on the son. The son claims that since Mrs. Looney satisfied the mortgage by marginal indorsement, she has the burden of showing that such satisfaction is not payment, and that she must prove this by a *quantum* of proof. The learned chancery court found for Mrs. Looney on every question of law and fact; and the son has appealed.

We affirm the decree of the chancery court. In 41 C. J. 821, in discussing the canceling of a release, the rule is stated: "A release or satisfaction of a mortgage may, upon proper grounds, be cancelled or set aside, and thereafter, unless the rights of third persons may preclude such relief, it may be reinstated and enforced as a lien." There is no allegation or showing that the rights of any third persons are involved in this case. In discussing the proper grounds for such cancellation, the rule is stated (41 C. J. 821): "And generally this relief may be had where the mortgage shows some special equity, as a failure of consideration on which the release was given." *Shapard* v. *Mixon*, 122 Ark. 530, 184 S. W. 399, is cited to sustain the text.

The case of *Stephens* v. *Keener,* 199 Ark. 1051, 137 S. W. 2d 253, (discussing the *quantum* of proof to set aside a written instrument) is cited and relied on by the appellant; but we hold that the appellee has met that burden even if the rule of that case applies to a marginal indorsement. But in Jones on Mortgages, (8th ed.), § 1262, in discussing the effect of a release, the author states: "If after an entry of satisfaction the debtor continues to pay interest upon the same debt, and the creditor remains in possession of the mortgage bond or note, the presumption of payment arising from such entry is rebutted."

In 36 Am. Jur. 924, in discussing the effect of a release, the rule is stated: "On the other hand, the recital in the release of a mortgage that it was executed in consideration of the payment of the debt named therein, while *prima facie* evidence of the facts stated, is not conclusive thereof, and such recital may be overcome by evidence which clearly shows that the debt had not in fact been paid."

And in 36 Am. Jur. 931-2, in discussing the effect of a marginal entry, the rule is stated: "The owner of a mortgage may, however, prove that a cancellation thereof of record was made by accident, mistake or fraud, and in a proper case relief may be granted in equity from the recording of a release of a mortgage."

That Mrs. Looney brought herself within the scope of these citations is shown by the following excerpts from the record. She testified (Tr. 18): "A. Well I got crippled at Eureka Springs and was going on crutches and a nerve was affected and I was sick a long time, and Willie kept begging me to release the mortgage and he said that Judge PITTMAN said that the taxes cost so much on these mortgages that if I didn't release it, it would soon take what money I had to pay the taxes, and I didn't intend to do that until I saw a lawyer, but when I was sick and had a headache the day before and was so nervous and shaking and they came down there and kept wanting me to release it. Willie said these men, the assessors, was going to meet the next day and raise the taxes and would assess this mortgage if I didn't release it and he said it would cost me so much to pay the taxes it would soon take all the money. Well I didn't want to do it until I talked to a lawyer, but I was sick and really wasn't able to come over here. I couldn't walk except on crutches and should have been in bed. I wasn't satisfied and I didn't want to release it, but I thought the taxes I'd have to pay on it would soon take all the money and I haven't very much money left. Q. He convinced you by what he told you that it would be better to mark the mortgage satisfied, even if it was not paid? A. Yes, he said he would make me a new note and deed and bring it that day, but then he said the bank was closed and he couldn't get the note, but said he would make the note and bring it the next day. He said, 'Why, I aim to treat you right as long as I have anything to eat, you will have something to eat.' Q. He also promised to give you a new note in place of the old one? A. Yes. Q. What kind of a note did he promise to give you? A. It was to be just like that one. Q. You mean secured by a mortgage or what? A. He was to give me the deed and a new note.

Q. He was to give you a new note and the deed? You mean give you a deed back to the land or what? A. I don't know, he said he would make me safe with a bankable note. Q. Oh, a bankable note? A. Yes, he said he would, but he said that day that the bank was closed and he couldn't get in the bank to get it, but he said the first thing the next day he would and he wanted me to come on over here and mark that because that these assessors —that I would have to pay taxes on this mortgage, this note, that was on record.''

In describing how her son treated her after she had executed the marginal release, she said (Tr. 23) : ''Q. And during this time your son, Willie, was living in your old home place that belonged to your father and that you had sold him, and he was still owing you money because he had not paid for the place, is that right? A. Yes, I told him I wouldn't treat·a dog like I was treated and told him if he wanted anything and I had it, I'd give it to him, and asked him to let me have enough money to buy a loaf of bread or some milk, and about that time his wife · come along and asked him for some money and he gave her a dollar and she said that wasn't enough, and he hauled down in his pocket and gave her a five dollar bill and I didn't have no lightbread.''

On cross-examination, she testified (Tr. 30) : ''Q. If your son was refusing to do these things, why did you wait six years before you brought suit? A. I didn't want to bring suit on my own child. Q. Well you did, didn't you? A. I had to or starve one. Q. And you state positively to the court that no payments were ever made to you on the principal of that note? A. No payments only the interest. Q. When he would bring that produce in, would he tell you to credit it? A. Yes. Q. Did you show him the note to show him you had so credited it? A. No, he said if anybody ever sued him, he'd go in bankruptcy.''

If Mrs. Looney had received the $1,350, she would not have been in the destitute condition she was in when she was appealing to her son for money; and that very fact speaks volumes. Furthermore, the note was due five years after date, and contained no acceleration clause or permission for earlier payment, and it is strikingly

strange that the son testified that he paid off the note several years before it was due. The fact that the mother kept the note and mortgage indicates very strongly that her son had never paid her. His testimony as to where he got the money to pay her was vague and indefinite; and his explanations were unsatisfactory.

We deem further review of the facts and further citations of authority to be unnecessary. The failure of Willie Swor to deliver to his mother the new security constituted a failure of consideration for the marginal release. The decree of the chancery court is in all things affirmed.