614

4-9798                                    249 S. W. 2d 125

Opinion delivered May 26, 1952.

Rehearing denied June 23, 1952.

*Cecil Grooms,* for appellant.

*Gerald Brown* and *Kirsch & Cathey,* for appellee.

HOLT, J. Mrs. Vine McDaniel died testate, at the age of 73, July 11, 1951. · She left surviving four adult children,—appellant, Hugh W. McDaniel, (unmarried) and appellees, J. Elgin McDaniel, Louisa Angeline M. Barron and Eula M. Schug. On April 28, 1941, she executed her will in which Hugh was named as executor to act without bond. The will further recited: "I have the following named children, to-wit: J. Elgin McDaniel, Louisa Angeline McDaniel Barron, Eula McDaniel Schug, and Hugh W. McDaniel. I hereby direct that the first three children, to-wit: J. Elgin McDaniel, Louisa Angeline McDaniel Barron, Eula McDaniel

Schug, take none of my property. I give to my said son, Hugh W. McDaniel, all of my property of every kind and nature, personal, real and mixed and wherever situated, which I may own at my death."

Appellees brought the present action in which they alleged that their mother died, "seized and possessed of the northwest quarter of the southwest quarter of section 27, township 16 north, range 6 east, Greene County, Arkansas, except approximately one acre out of the northwest corner thereof, being 420 feet long east and west and 105 feet north and south; . . . plaintiffs further state that the said Vina McDaniel died testate; that under the terms of the will as drafted she made no provisions for plaintiffs, but that said will was made and was continued in effect unchanged on the express promise and agreement of the defendant that he would convey and deliver to each of the plaintiffs such part of her estate as they would have been entitled to had she died intestate. . . . that under its terms as written the defendant would be the absolute owner of the property above described, but that by reason of the promise and agreement of the defendant as made to his mother, he is trustee for plaintiffs of the respective interests they would have had in said property had she died intestate."

Their prayer was that appellant "be held to be a trustee of all the property belonging to their mother at the time of her death for all of them; that said properties be ordered sold for the purpose of partition and division among the interested parties."

Appellant answered, admitting that his mother died testate, that under the terms of the will, he is the absolute owner of the above described property, but denied that he was a trustee for appellees for any interests in the property, and denied that the will was made and continued in effect without change on his expressed promise to convey to appellees such part of the property to which they would have been entitled if their mother had died intestate.

The Chancellor found the issues in favor of appellees and from the decree is this appeal.

The parties agreed that (in the words of appellees): "There are but a single issue of fact and a single question of law involved in this lawsuit: (1) Did Vina McDaniel, after making her will, direct appellant, the named beneficiary, to make distribution of her estate on an equal basis among all her children, and did he promise so to do? (2) If so, is he constructively charged as a trustee *ex maleficio* when he now refuses to perform?"

The facts disclose that the will in question was executed April 28, 1941. There is no question as to the mental capacity of Mrs. McDaniel to make the will. At the time of its execution, Hugh was in Texas, a soldier in the Army of the United States and was in active service from January 6, 1941, until his discharge November 24, 1944. On his discharge, he returned to his mother, lived with her (with the exception of some eighteen months while he was employed in Memphis, Tenn.) as he had done prior to his Army service, assisted her in business and cared for her until her death. While in the Army, he made regular allotments to his mother. He had never married. Some time before his discharge, his mother wrote him that she had made a will leaving her property to him and this was his first knowledge of any will. He positively denied making any promises to his mother that he would share the property with appellees. We find no testimony that Hugh knew that his mother was going to make a will until after its execution.

The testimony of the three interested appellees was similar in effect. Eula Schug testified as to statements alleged to have been made by Hugh after their mother's funeral when the four children were present. "Q. What did he (appellant) communicate to you at that time? A. Well, we were all there together, just the four of us, and he said, 'Well, I'm going to tell you that I have a will to the forty acres of land, 39 acres, and I have a deed for the place in Hot Springs, but now, it was

Mother's *desire* all along that you all have just as much as I do out of it and I have always promised her I would. I don't know why she made it that way, but it was her *intention* that you have your part and I have always promised her I would see after it like that and that is what I am going to do.' "

Appellee, Louisa Angeline M. Barron, in effect, corroborated Eula's testimony, using the expression, "but Mother *wanted* each one to have their part, etc." Appellee, J. Elgin McDaniel, also corroborated Eula and Louisa Angeline, using this expression, "—and he said, 'well, it's not as bad as you might think it is. It's Mother's *request* that I divide with you all.' "

Appellant stoutly denied any such promises to appellees: "Q. Did you tell these three people at any time that your mother wanted you to do that and you did promise her you would divide it? A. No, never did tell that she wanted me to do that, or told me to do that. Not at any time."

Mr. Stone, the attorney who drafted Mrs. McDaniel's will, testified: "Q. Tell the court what he (appellant) said to you. A. He told me his mother told him that although she was making the property to him through the will, yet she *wanted* him to share that property with the others; that is, share and share alike. Q. What did he say that he had promised his mother? A. He promised his mother he would divide that property, share and share alike. Q. Did he state in this conversation that was his intention to so do? A. Yes, sir, he did at that time. Yes he did."

Hugh flatly denied this testimony of Stone: "Q. When you went to see Mr. Stone, your mother's lawyer, you told him you would divide it up among the four of you? A. No, sir. Q. You didn't tell him that? A. No, sir."

The testimony of the three appellees, interested parties in the result, "will not be regarded as undisputed in determining the legal sufficiency of the evidence,"

*Elmore* v. *Bishop,* 184 Ark. 243, 42 S. W. 2d 399, (Headnote 6).

We think it of special significance that from the date Mrs. McDaniel made her will in 1941 until her death in 1951, the record discloses she had been absolutely silent as to the disposition of her property, other than the positive directive in her will. She made no statements to appellees in her last illness, or before, as to any *directions* to Hugh (appellant) relative to the disposition of her property as appellees now claim she made and which they seek to enforce.

She and appellant appear to have been devoted to each other. Whether the mother, in making her will, was actuated by natural instinct to protect a son (appellant) burdened with a certain admitted birth handicap, or whatever her motive, she had the right to do with her property as she pleased.

Before appellees can set aside and destroy the positive directive and solemn provisions in the will, and establish a trust in opposition thereto, the burden was on them to do so by clear, cogent and convincing evidence. We said in *Nevils* v. *Union Trust Company, Executor,* 111 Ark. 45, 163 S. W. 162: ''This court, at an early date, established the rule that it is 'admissible to prove a trust in opposition to a deed or other written instrument, but the evidence for this purpose must be of so positive character as to leave no doubt of the fact,' '' and in *Stephens* v. *Keener,* 199 Ark. 1051, 137 S. W. 253, we said:

'' 'The presumption that an instrument executed with the formality of a deed, or a contract deliberately entered into, expressed on its face its true intent and purpose, is so persuasive that he who would establish the contrary must go far beyond the ordinary rule of preponderance. To demand less would be to lose sight of this presumption, which is one of the strongest disputable presumptions known to the law. Hence, courts have, with great uniformity, in this class of cases, required the proof that should destroy the recitals in a solemn instrument to be clear, specific, satisfactory, and

of such a character as to leave in the mind of the chancellor no hesitation or substantial doubt.' "

As we read this record, the most that can be said of appellees' testimony is that their mother "desired," "wanted," and "requested" that appellant share the estate with the appellees. She gave no directions that he do so. We think this evidence falls far short of meeting the heavy burden of proof above required by appellees.

As indicated, we find no evidence that Hugh practiced any fraud or undue influence whatever on his mother to induce her to will her property to him.

Accordingly, the decree is reversed and the cause remanded with directions to dismiss appellees' complaint for want of equity.