O. T. BAKER, Guardian *v*. Walter A. HELMS et ux.

5-4409                                      423 S. W. 2d 540

Opinion delivered February 5, 1968

*Guy H. Jones* and *Phil Stratton,* for appellant.

*George F. Hartje Jr.,* for appellees.

John A. Fogleman, Justice. This appeal is taken from a decree of the trial court dismissing appellant's complaint seeking to set aside a deed dated August 17, 1956, from one E. E. Hodges and his wife, Olga, to appellee Hazel Ella Helms, one of their seven children living at the time of the execution of the deed.[1]

---

[1] It is another of life's sad stories of acrimonious controversy among siblings over the disposition of property acquired by their parents.

This deed conveyed lots in Vilonia on which the Hodges home was located. It was recorded on November 16, 1956. The consideration recited is $1.00 and other valuable considerations. A reservation in the deed is worded as follows:

"Retaining a dower interest for the said E. E. Hodges & Olga A. Hodges for the use and possession during their natural life."[2]

The attack on this deed is twofold; i. e., (1) breach of a continuous promise by appellees of future support to appellant's ward and his wife, and (2) fraud in procurement. Appellees deny that a promise of future support to E. E. and Olga Hodges constituted any part of the consideration for the deed and assert that any claim for cancellation of the deed is barred by the statute of limitations and laches.

At the time of the trial, E. E. Hodges was 91 years of age, 10 years older than he was when the deed was executed. He had built a modest home on these lots which he had owned since 1906. The deed in question had been drawn by an attorney at Beebe and the acknowledgment thereof was before him.

. Mrs. Olga Hodges died April 30, 1960, having resided on the property until her death. E. E. Hodges resided there after the execution of the deed, except for absences due to surgery and a broken hip, because of which he was a patient in hospitals and nursing homes. He was in hospitals and nursing homes in the latter part of 1963 and early 1964. When he returned home, the appellees had gone to California. He remained at

---

[2]While this reservation may seem ambiguous, it is not questioned that the correct construction of the clause effects the retention of an estate for the life of the survivor of E. E. and Olga Hodges.

home for six or seven months during their absence. A short time before this case was filed, he broke his hip and went to a hospital, after which his son, Doyle, took him to a nursing home where he was at the time of the trial. His maintenance cost there exceeds the welfare department allowance by $70 per month, the payment of which is borne by appellee Hazel Helms and three of her brothers in rotation.

When the deed was executed, appellees had sold a motel at Beebe and were apparently in good financial condition. At least six years before the execution of the deed, the parents had executed a will or wills devising and bequeathing everything they owned to appellee Hazel Helms. This was done with the acquiescence of most, if not all, of the Hodges children. One of them, Doyle (W. E.) Hodges (who admits having promoted this suit), claims to have instigated and encouraged this testamentary action. It is clear that it was not contemplated at that time that the Helmses would ever live with the parents at the family home. It is certain that there was no agreement at this time that they would support the father and mother.

The Hodges family was raised in comparative poverty. Several of the children left home at early ages to seek employment. Hazel was probably the first to leave when she was 14 or 15 years of age. There seems to be no dispute about the fact that thereafter she made substantial contributions to the maintenance and support of the family, particularly to her mother and father. The only dispute is about the extent of these contributions.

Hazel Helms testified that she and her husband moved in with her parents, at their invitation and urging, after the sale of the Beebe Motel, although she and her husband had previously planned to build their own home. She said that the move was considered by her mother and father for four or five months. The well at

the Hodges homestead had gone dry and the parents were persistent about the need for alterations. The will or wills had previously been made, but Hazel said she told her mother that if she and her husband were going to spend money for the home place, she would prefer a deed rather than a will. After the parents approved, she related, they went to the attorney's office in Beebe. While they wanted a will, she insisted on "a dower right." She stated that her parents voluntarily gave her the property, except for their right to live there.

After the execution of the deed, appellees moved into the parents' home, remodeled it and made substantial improvements thereto. They have maintained the property and paid all taxes thereon since that time. While appellees were apparently in good financial circumstances when the deed was executed, adversity has come upon them lately. These adverse conditions were attributable, at least in part, to the poor health of Walter Helms which has resulted in his becoming a wheel chair invalid since he had a leg amputated in 1964. So far as the record reveals, the only income of appellees is $300 per month from social security payments and veteran's pension payments to the husband. The wife says that she is unable to seek employment because of her husband's need for her attention.

Not long after the execution of the deed, the mother and father qualified for welfare grants and E. E. Hodges is still receiving a welfare check.

Appellees endeavored to sell the property in 1964 and 1966, but apparently were impeded by the reservation, in the deed. It is admitted that appellee Hazel Helms offered Doyle $500 to obtain their father's signature on a quitclaim deed which would make a conveyance of title to the property possible. Hazel Helms testified that her father was to have whatever the law allowed for his life estate from the proceeds of the sale.

No attempt was ever made by E. E. or Olga Hodges to rescind or cancel this deed. Appellant's complaint seeking to do so was filed April 24, 1967. The exact date of his appointment as guardian of E. E. Hodges does not appear, but it seems to have been subsequent to the appellees' listing of the property for sale by him as a real estate agent in January 1967.

Although one other son testified on each side, the real controversy is between Doyle Hodges and appellees. It seems clear that this brother has known of the existence of this deed since 1959. His brother who testified for appellant recalled having gone with his sister to a lawyer's office to discuss the drawing of such a document. The brother who testified for appellees said that he knew of the deed earlier, although he lived in California and had lived on the west coast since 1936.

The testimony as to the existence of an agreement on the part of Hazel Helms to support her parents for the rest of their lives is sharply conflicting. Most of it was given by Doyle Hodges and relates to statements of his sister after the deed to her was executed. When first asked about conversations with his sister about her responsibilities under the deed, he told of an occasion when Hazel, sitting with their mother and father, spoke on the subject. He said: "She says I promised to take care of—you only have a lifetime dower in it. Now what that means, I don't know." He also stated: "There's nothing I can recite about the commitment of the defendant if you want me to." In response to the trial judge's question whether his mother or father ever told him what constituted the consideration for the deed, he answered, in part:

"Said they were going to care for them. You know didn't make it very strong. Did—says this is disagreeable here. One statement from mother says Son, I wish we had a little home off to ourselves. I said if I ever get the money and in shape, I'll get

it for you. If they won't let you build it here, I'll build it somewhere else. Said they were supposed to take care of us but she don't cook half of the time.''

The date or dates of such statements are not given. Doyle Hodges and his wife also testified that on one occasion they got Hazel Helms off the street when she was intoxicated and driving an automobile. They said that, after taking her to their home, they went to the home of the oldest Hodges daughter where the two sisters got into a quarrel, after which Hazel was said by Doyle to have responded to their sister's accusation that she took their mother's home by saying that she took it because she had agreed to take care of them the rest of their lives. Doyle's wife's version was that Hazel said that she had taken the place and would keep it and would take care of ''Mama'' and ''Papa'' as long as she (Hazel) lived. Doyle testified that on another occasion, while his mother was living, his sister Hazel cursed their father and called him a ''s.o.b.'' and other names, and said to him, ''[Y]ou can only have a lifetime dower and I agreed to take care of you, but you can take care of yourself.'' Harold Hodges, who was younger than either Doyle or Hazel, was the son who testified on behalf of appellant. He moved to California in 1936, but visited at his father's home almost every summer. His sister had talked to him about getting the property conveyed to her about 1955 or 1956, and said the home was ''made'' to her and the ''folks'' would have a place to stay and would be well taken care of as long as they lived, according to his understanding. He went with her to the attorney in Beebe to talk about drawing up a will or deed for the place to go to her when their parents passed away, their having a home there as long as they lived. Later, in response to questioning by the trial judge, Harold testified that Hazel said, in the absence of their father and mother, that in order to get this property, she would

see that the folks were well taken care of as long as they lived.

On the other hand, Hazel Helms vehemently and repeatedly denied any such agreement.

I. O. Lee Hodges testified on behalf of appellees. He had left home in 1936, when about 21 years of age, and had lived in Oregon and California since that time. He stated that in 1957 or 1958, after extensive improvements had been made, he asked his mother if there was any "setup" to protect Hazel's interest. His mother replied, he said, that a will and the necessary papers had been made to protect her. His mother said to him that Hazel had done so much for them that she hoped she could be repaid. Mrs. Hodges' concern, said I. O. Lee, was a home near Hazel. He had known that Hazel had the deed since 1957 or 1958, having been told of it by his mother.

E. E. Hodges, the grantor, testified after the court adjourned to Meadow Lake Nursing Home upon invitation of appellees' counsel and following testimony by Doyle Hodges that his father could clearly reveal the situation. He denied knowing what he had signed but said he learned for sure what it was after about two years. On examination by appellant's counsel, he denied that Hazel ever used any language around him indicating that she would take care of him the rest of his life. He never talked to her about the matter since he discovered that he signed a deed.

A mere preponderance of the evidence is not sufficient to establish an alleged unperformed agreement on the part of the grantee in a deed to support the grantor where that consideration is not expressed in the deed. *Viesey* v. *Wooten,* 220 Ark. 962, 251 S. W. 2d 593; *Hammett* v. *Cannon,* 226 Ark. 300, 289 S. W. 2d 683. Evidence to engraft upon a deed a consideration other than that expressed therein must be clear, cogent and convincing.

*May* v. *Alsobrook,* 221 Ark. 293, 253 S. W. 2d 29. Evidence to justify the cancellation in equity of a deed properly executed and acknowledged must also be something more than a mere preponderance. It must be clear, strong and conclusive, or clear, cogent and convincing, or clear, unequivocal and decisive. *Williams* v. *Shaver,* 100 Ark. 565, 140 S. W. 740; *Stephens* v. *Keener,* 199 Ark. 1051, 137 S. W. 2d 253; *Johnson* v. *McAdoo,* 222 Ark. 914, 263 S. W. 2d 701; *Swim* v. *Brewster,* 177 Ark. 1171, 9 S. W. 2d 560. Especially is this burden applicable when fraud is alleged as the basis of cancellation. *Murphy* v. *Osborne,* 211 Ark. 319, 200 S. W. 2d 517; *Herr* v. *Murphree,* 240 Ark. 834, 402 S. W. 2d 393.

In a letter constituting his findings, the trial judge found all issues of law and fact in favor of appellees. The court's decree contained these specific findings of fact:

"That certain Warranty Deed executed by E. E. Hodges and wife, Olga Hodges, on the 17th day of August, 1956, and recorded in Deed Record Book 140 at page 217 in the office of the Recorder within and for Faulkner County, Arkansas, was executed for a valuable consideration, and that said deed should not be cancelled nor set aside. That said deed was not executed in return for any continuing promise of support by the defendants herein to E. E. Hodges or his wife, Olga Hodges, and that the said Hazel Ella Helms took title to the following described property subject to a life estate in E. E. Hodges and his wife, Olga Hodges, who is now deceased."

When we consider the testimony showing the contributions made by Mrs. Helms to her mother, father, brothers and sister, before the execution of the deed, the improvements made by the Helms on the property after the deed, and the fact that the mother and father resided in the home as long as, and whenever they de-

sired to do so, we cannot say that the chancellor, who saw and heard the witnesses and observed their manner and demeanor while testifying, erred in finding that appellant failed to meet his burden. We cannot, for that matter, say that his findings are against the preponderance of the evidence. Thus, it is not necessary that we consider the very conflicting testimony relating to manner of performance of the alleged contract.

The decree of the lower court is affirmed.